# IN THE SUPREME COURT OF IOWA

No. 10–1291

Filed June 22, 2012

**PEOPLES TRUST & SAVINGS BANK,**

Appellee,

vs.

**SECURITY SAVINGS BANK,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Boone County, William C. Ostlund, Judge.

Appellant asserts the court of appeals erred in granting appellee's motion to dismiss appeal and the district court erred in granting summary judgment. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Steven W. Hendricks of Kersten Brownlee Hendricks L.L.P., Fort Dodge, for appellant.

Gary A. Norton of Whitfield & Eddy, P.L.C., Des Moines, for appellee.

**APPEL, Justice.**

This case presents a battle between banks over the proceeds of the sale of cattle by a financially strapped borrower who had financial dealings with both banks. When Security Savings Bank (Security) obtained the proceeds of the sale, Peoples Trust and Savings Bank (Peoples) claimed a security interest in the proceeds and sued for conversion.

Peoples filed a motion for summary judgment. The district court found that under the undisputed facts, Peoples had a security interest in the proceeds of the sale of cattle superior to that of Security. The district court further held that the undisputed facts established that Peoples had not waived its superior security interest by course of conduct. As a result, the district court granted summary judgment in favor of Peoples on its conversion claim and entered judgment in the amount of $299,353.94.

Security appealed. After the filing of the notice of appeal, Peoples commenced garnishment proceedings against Security to enforce its judgment. Faced with the prospect of garnishment, Security paid the underlying judgment. Peoples then moved to dismiss the appeal, claiming that by paying the judgment, Security had waived its right to appeal.

We ordered that the motion to dismiss the appeal be considered along with the underlying merits of the case and transferred the case to the court of appeals. The court of appeals determined that Security had waived its right to appeal and dismissed the case. We granted further review.

At the outset, we first consider whether Security waived its pending appeal by paying an underlying judgment when Peoples had

commenced garnishment proceedings to enforce the judgment it obtained in the district court. Based on the most persuasive modern authority, we conclude that a defendant faced with postjudgment garnishment does not waive a pending appeal by paying the judgment in order to avoid further enforcement proceedings.

We next turn to the underlying merits of the case. We conclude that under the undisputed facts of the case, the district court correctly determined that Peoples had a security interest in the cattle proceeds superior to Security's interest and that Peoples did not waive its superior position through its course of conduct. As a result, we affirm the judgment of the district court.

**I. Factual and Procedural Background.**

**A. The Underlying Transactions.** Jeffrey Gilley was a feeder cattle and cow calf operator with a long-term relationship with Peoples. Gilley and his spouse borrowed substantial funds from Peoples over time, including $235,000 on January 17, 2003; $100,000 on January 5, 2004; $54,200 on April 1, 2004; $30,340 on January 10, 2005; and $120,000 on January 11, 2005.

As security for the loans, Peoples obtained from the Gilleys a security interest in "Farm Products," which specifically covered "livestock" and "cattle." Peoples filed UCC-1 financing statements with the Iowa Secretary of State on January 3, 2000 and on December 16, 2003. By 2007, however, Peoples was concerned about the state of its credit line with Gilley and determined not to make additional loans to Gilley.

Beginning in January 2007, Gilley and Ray Wilson obtained financing from Security to finance additional purchases of cattle. Wilson had known Gilley for a long time, had been a customer of Security for

many years, and was a cattle buyer for Swift & Co. Security agreed to provide financing for cattle purchases but required both Gilley and Wilson to be cosigners on the loan. Both Gilley and Wilson also signed security agreements, which were filed with the Secretary of State. Wilson would buy the cattle. The invoices listed Gilley as the purchaser and also charged Gilley a commission for Wilson's services. Wilson passed on the invoices to Gilley, who would write a check on Gilley's solely owned personal account at Security. The invoice would also be presented to Security, which would deposit funds in Gilley's personal account to cover the purchase. Gilley raised the cattle purchased with loan proceeds on his farm. When they were ready for sale, Wilson sold them to Swift & Co. The proceeds were generally payable to Gilley. During the spring of 2008, however, Wilson became suspicious that Gilley was selling cattle outside their agreed upon process. As a result, Wilson instructed buyers of the cattle to make checks out to Gilley and Security or to Wilson himself.

Peoples was unaware of the financial relationship between the Gilleys and Security until early 2008, when an employee of Peoples conducted a UCC search on Gilley and found the UCC financing statement filed by Security. The officer in charge of the Gilley line at Peoples, Jamie Brant, contacted Gilley and was told that the Security UCC filing was based on custom feeding occurring on his property. Gilley claimed that he was being paid for his custom feeding in cattle and that the cattle so obtained were subject to Peoples' security interest. Gilley stated that when the cattle were sold, he would pay down the Peoples indebtedness. On March 30 and April 1, 2008, Peoples sent notices to buyers and Gilley under the Food Security Act of 1985, informing them of Peoples' security interest in cattle owned by Gilley.

Gilley sold the cattle as represented to Peoples, but he paid the proceeds to Security. When Peoples learned of these facts, it filed in March 2009 a conversion action against Security seeking to recover the proceeds of the cattle sales. Peoples filed a motion for summary judgment, which the district court granted. The district court then entered a judgment against Security in the amount of $299,353.94, plus interest. Security filed a notice of appeal on July 23, 2010.

**B. Events Related to Potential Waiver of Appeal.** After Security filed its notice of appeal, the parties engaged in correspondence regarding the appeal status.[1] On August 2, 2010, Security asked Peoples what its position was regarding staying levy and execution pending appeal. Without specifically answering the inquiry, Peoples commenced garnishment proceedings against Security on August 16. On August 20, Security inquired of Peoples why garnishment was necessary, noting that Security would prefer to set up an escrow arrangement but would pay the judgment in full. Peoples responded on August 20 by stating that if Security paid the judgment in full with certified funds, "then doing so will consequently make the garnishment unnecessary." Peoples further indicated on August 20 that it would accept payment of the sum of $301,430.73 "to fully satisfy the judgment" and that "[o]nce the payment is received, the garnishment procedure will be withdrawn." Security

---

[1]We have stated that in rare circumstances, when facts relevant to a motion to dismiss cannot be shown in any other manner, application should be made to the supreme court for appointment of a commissioner to receive evidence and propose findings of fact upon which the court may base its findings and conclusions in relation to a motion to dismiss. *Johnson v. Johnson*, 301 N.W.2d 750, 753 (Iowa 1981). In this case, both parties have submitted exhibits in support of their respective positions without objection on appeal. We further note that no party seeks an opportunity to develop any additional evidentiary record related to the motion to dismiss. Under these circumstances, we treat the exhibits submitted by the parties as a stipulated record upon which we may consider the merits of the motion to dismiss.

responded on August 23 by stating that "[s]o there [is] no misunderstanding, this payment is made as a result of a demand to satisfy the judgment pending appeal." Security further stated that it would "prepare a pleading to be filed acknowledging payment of the judgment without waiving the pending appeal."

Security paid the judgment in full through a wire transfer on August 23. Security did not file a pleading acknowledging payment of the judgment without waiving the pending appeal as stated in its e-mail correspondence. Upon receipt of the funds, Peoples dismissed its garnishment summons and complaint.

Peoples filed a motion to dismiss this appeal, asserting Security waived its right of appeal by voluntarily paying the judgment in lieu of seeking a supersedeas bond pursuant to Iowa Rule of Appellate Procedure 6.601. Security resisted the motion to dismiss, arguing the payment was not voluntary because payment was tendered "only as a result of the garnishment and only because the judgment could not be stayed." Security also asserted that a party does not waive its right to an appeal if payment is made after the notice of appeal is filed. In an affidavit attached to Security's resistance, the attorney for Security stated that he "advised Security Savings Bank that an appeal did not stay proceedings under a judgment or order unless the Appellant executed a bond, which was not available." The attorney also stated,

> After the Notice of Garnishment was served on Bankers Bank, I contacted [the attorney for Peoples Trust] to let him know that the Notice of Garnishment was embarrassing to my client and that we would like to make arrangements to get the judgment paid. The wire transfer was made as a result of the Notice of Garnishment. The payment was not voluntary but caused by the garnishment.

Also attached to Security's resistance were copies of the notice for entry of foreign judgment filed in Wisconsin, the e-mail correspondence quoted above, and the acceptance of service of the garnishment summons and complaint signed by Security's attorney.

The court of appeals dismissed the appeal. The court first rejected Security's argument that an appeal is not waived when judgment is paid after a notice of appeal is filed. The court relied on *Credit Industrial Co. v. Bendixen*, 255 Iowa 1020, 1022, 125 N.W.2d 262, 263 (1963), which held a party waives appeal when it satisfies a judgment before or simultaneously with a notice of appeal. The court found no "distinction of merit" between payment of judgment before or simultaneously with filing the notice of appeal. *Id.*

The court of appeals also rejected the argument that the garnishment proceedings rendered the payment involuntary. The court of appeals observed that Security could have filed a supersedeas bond to stay execution of the judgment. The court of appeals also noted that the e-mail correspondence confirmed that Security considered filing a supersedeas bond but ultimately rejected the idea in favor of paying the judgment to avoid the embarrassment caused by the garnishment. We granted further review.

## II. Discussion of Merits of Motion to Dismiss.

**A. Iowa Approach to Appellate Waiver.** The precise issue before us in connection with the motion to dismiss the appeal is whether Security lost its right to appeal when, after filing a notice of appeal, Security paid the district court judgment in response to the threat of Peoples to commence garnishment proceedings to collect on the district court judgment but did not avail itself of the opportunity to file a supersedeas bond.

Our early cases established the general principle that the "voluntary" payment of a judgment leads to a loss of the right to appeal. For instance, in *Hipp v. Crenshaw*, 64 Iowa 404, 405, 20 N.W. 492, 492 (1884), *overruled by Yeager v. Durflinger*, 280 N.W.2d 1, 4 (Iowa 1979), we held that satisfaction of a judgment in order to allow the defendant to borrow money on land upon which the judgment was a lien amounted to a voluntary satisfaction and not payment under duress.

While *Hipp* did not address the issue of payment when faced with execution of the underlying judgment, that issue was squarely raised in *Manning v. Poling*, 114 Iowa 20, 83 N.W. 895 (1900). In *Manning*, the plaintiff sought to enforce a judgment by obtaining a sheriff's deed on the defendant's land. *Manning*, 114 Iowa at 22, 83 N.W. at 896. The defendant then paid the amount of the judgment to redeem the property. *Id.* After canvassing decisions from other jurisdictions discussing voluntariness, the court concluded:

> The result of all the authorities is that the party making payment must be put to his choice between the comparative evils of the inconvenience and loss by the detention of his property, and the payment of an unjust and illegal demand.

*Id.* at 24, 83 N.W. at 896. The *Manning* court explained that "if there be other adequate means of escaping the imminent infringement of property rights, these should be resorted to, rather than that litigation be postponed by the payment of the controverted claim." *Id.* at 24, 83 N.W. at 896–97. The *Manning* court held that, because the party could have obtained a restraining order from the court to stay execution of the judgment, payment of the amount necessary to redeem the property in dispute was voluntary. *Id.* at 27, 83 N.W. at 897; *see also In re Hoyt's Estate*, 182 Iowa 876, 878–79, 166 N.W. 297, 298 (1918) (citing *Manning* with approval and stating that "[i]f the mere order to pay coerces

payment, then every affirmance on the ground that a judgment had been complied with before enforcement or threat of enforcement was erroneous"). In a series of later cases, we held that the *Manning* principle applied regardless of whether the notice of appeal was filed before, after, or simultaneously with the payment of the judgment. *See Bendixen*, 255 Iowa at 1022, 125 N.W.2d at 263 (simultaneous); *Bates v. Nichols*, 223 Iowa 878, 880, 274 N.W. 32, 35 (1937) (after); *A.E. Shorthill Co. v. Des Moines Dep't Store Co.*, 151 N.W. 65, 66 (Iowa 1915) (before).

In recent years, however, decisions of this court have chipped and cracked the foundation of the appellate waiver doctrine. Three cases illustrate the development.

In *Vermeer v. Sneller*, 190 N.W.2d 389 (Iowa 1971), this court considered whether the payment of court costs led to loss of the right to appeal. In *Vermeer*, the plaintiffs lost in the district court and were assessed court costs. *Vermeer*, 190 N.W.2d at 395. The plaintiffs appealed. *Id.* The plaintiffs, however, paid court costs in order to get a clear title opinion on real estate in which the plaintiffs sought a loan. *Id.* The question arose whether the payment of the court costs resulted in loss of the right to appeal.

The *Vermeer* court said no. *Id.* at 396. Of course, the case involved the payment of court costs rather than a judgment. But the rationale in *Vermeer* was noteworthy. The *Vermeer* court emphasized that it would be ignoring the realities of the situation to say that by paying minimal costs below, the plaintiffs "knowingly and intelligently" waived their right to appeal. *Id.* at 395. In considering whether a party waived rights on appeal through payment of costs or judgments, the *Vermeer* court began a shift away from a "voluntariness" test to a knowing and intelligent waiver test that is more favorable to a party

seeking to avoid dismissal of the appeal. *See id.* at 395–96. The *Vermeer* court also emphasized public policy reasons for encouraging the payment of court costs, a concept that resounds even more strongly today. *Id.* at 396.

Three years after *Vermeer*, we decided *Hegtvedt v. Prybil*, 223 N.W.2d 186 (Iowa 1974). In *Hegtvedt*, the successful plaintiff initiated garnishment proceedings to collect on the judgment. *Hegtvedt*, 223 N.W.2d at 188. The district court ordered payment of the judgment and the defendant made payment in accordance with the court order. *Id.* Although the *Hegtvedt* court noted that the defendant had failed to obtain a supersedeas bond to stay execution of the judgment, the payment was still under compulsion because it was made in compliance with a court order. *Id.* at 188–89. While *Hegtvedt* did not expressly overrule *Manning*, the decision undercut its rationale as the defendant had an available remedy that would have prevented the entry of the district court's enforcement order, namely, the filing of a supersedeas bond.

Significantly, *Hegtvedt* also stated that payment by compulsion does not amount to a "voluntary relinquishment of a known right." *Id.* at 188. The *Hegtvedt* court's use of a waiver, rather than a voluntariness test, embraced a policy of protecting unsophisticated litigants from unintended loss of a valued right—the right of appeal. *See also Johnson v. Johnson*, 301 N.W.2d 750, 753 (Iowa 1981) (acceptance of small benefit not adequate to demonstrate party "voluntarily and knowingly waived her right to appeal"); *Millsap v. Cedar Rapids Civil Serv. Comm'n*, 249 N.W.2d 679, 683 (Iowa 1977) (acceptance of benefits of pay and reinstatement in employment case was not "relinquishment of a known

right" made "knowingly and intentionally, with knowledge of the circumstances").

Four years after *Hegtvedt*, we decided a case that pounded another crack in the appellate waiver doctrine. In *Yeager*, the defendant's lender, for reasons not described in the opinion, refused to provide a supersedeas bond to stay enforcement of the judgment. *Yeager*, 280 N.W.2d at 4. The plaintiff took steps to enforce his judgment, including subjecting the defendant to a debtor's examination and transcribing the Wapello County judgment into the records of Jefferson County, where the defendant owned real estate. *Id.* The Wapello County sheriff levied upon some of the defendant's personal property, including grain, hogs, and cattle. *Id.* The defendant then sought a loan from his lender. *Id.* After pocketing a $10,000 nonrefundable commitment fee, the lender refused to approve the loan unless the judgment lien was removed. *Id.* The lender further refused to accept the posting of a supersedeas bond. *Id.* The defendant then suggested to the plaintiff that a fund representing the judgment be placed in escrow in exchange for release by the plaintiff, but the plaintiff refused to go along. *Id.* At this point, the defendant paid the judgment in full and obtained a release from the plaintiff. *Id.*

Under the circumstances, the *Yeager* court refused to apply the appellate waiver doctrine. *Id.* The *Yeager* court noted that the requirements of the lender and the intransigence of the plaintiff forced the defendant to satisfy the judgment or face larger losses. *Id.* Citing cases from Illinois, Ohio, and Missouri, the *Yeager* court concluded that *Hipp* was "not in accord with recent developments" in the area of appellate waiver. *Id.* The *Yeager* court further concluded that the result was in conflict with *Hipp*, which was specifically overruled. *Id.*

The posture of this case is somewhat different than that in *Vermeer*, *Hegtvedt*, or *Yeager*. *Vermeer* may be distinguished from the present case in that it involved merely payment of court costs, not a judgment. In *Hegtvedt*, the defendant paid the judgment pursuant to a court order, not simply as a result of a threatened garnishment. This case is in some ways more similar to *Yeager*, where the judgment was satisfied without a court order requiring payment. Unlike *Yeager*, however, Security did not face a lender who refused to accept a supersedeas bond as adequate protection from a judgment lien. Thus, although *Vermeer*, *Hegtvedt*, and *Yeager* represent a distinct trend, they do not mandate a result in this specific case. These cases do raise the important question, however, of whether the recognized exceptions so swallow the traditional approach to appellate waiver that we should take this occasion to give the traditional approach a substantive overhaul.

**B. Caselaw from Other States on Appellate Waiver.** As we often do, we canvass cases in other jurisdictions in our effort to determine the best approach to Iowa law. Cases from other jurisdictions have also struggled with the appellate waiver issues raised in this case. *See generally* E. H. Schopler, Annotation, *Defeated Party's Payment or Satisfaction of, or Other Compliance with, Civil Judgment As Barring His Right to Appeal*, 39 A.L.R.2d 153 (1955). The state courts are divided on the question of whether payment or failure to file a supersedeas bond results in loss of appellate rights and on whether the threat of garnishment is sufficient to allow for payment of a judgment without losing the right of appeal.

Even recently, some state courts have adhered to a traditional per se rule holding that payment of a judgment under any circumstances bars an appeal in light of the availability of obtaining a stay by posting

an appellate bond. For example, in *Lyon v. Ford Motor Co.*, 604 N.W.2d 453 (N.D. 2000), the North Dakota Supreme Court emphasized both theoretical and practical reasons for enforcing the rule. The *Lyon* court noted that, from a theoretical point of view, a cause of action giving rise to a judgment ceases to exist when the judgment is paid. *Lyon*, 604 N.W.2d at 457. Further, the *Lyon* court emphasized the availability of bond pending appeal. The *Lyon* court stated:

> Although [staying the enforcement of a judgment] is [not] a jurisdictional prerequisite to an appeal, we see no utility in judicially authorizing yet another avenue for protection from judgment collection efforts during the pendency of an appeal, which would result in little more than a rash of restitution suits for recovery of voluntary payments on later-reversed judgments.

*Id.*; *see also Hermesch v. Haverkamp*, 381 P.2d 360, 362 (Kan. 1963) (payment of a judgment, even if pursuant to execution, cuts off the right to appeal where no request for bond was made); *Kelm v. Hess*, 457 N.E.2d 911, 911–12 (Ohio Ct. App. 1983) (threat of garnishment did not render the payment involuntary in light of the defendant's opportunity to obtain a stay of the trial court judgment by posting an adequate appeal bond).

Other state courts are only slightly less stringent. For example, the Court of Appeals of Arkansas has held that while the failure to post an appellate bond often may result in loss of appellate rights, a party might avoid dismissal by showing that a supersedeas bond was unavailable. *See Lytle v. Citizens Bank of Batesville*, 630 S.W.2d 546, 547 (Ark. Ct. App. 1982).

A third group of state courts have moved further away from the traditional rule by emphasizing the requirement of a "knowing and intelligent waiver" of rights free of coercion before appellate rights are cut off. For example, in *Wheeler Springs Plaza, LLC v. Beemon*, 71 P.3d

1258, 1261 (Nev. 2003), the *Beemon* court took the view that "actual or potential threat of garnishment or execution is sufficient coercion to avoid a mootness challenge based upon payment of the judgment."

An approach similar to *Beemon* was taken by an appellate court in Florida in *Consortion Trading International, Ltd. v. Lowrance*, 682 So. 2d 221 (Fla. Dist. Ct. App. 1996). In that case, the appellee filed a motion to dismiss the appeal after the appellant paid the final judgment. *Lowrance*, 682 So. 2d at 222. The appellee argued that the appellant should have attempted to stay enforcement by posting a supersedeas bond. *Id.* The court rejected this argument. The Florida court explained the fact that the appellant "could have obtained a stay of execution pending appeal by posting [a supersedeas bond] but did not is of no legal import. . . . Appellant's right to appeal is not conditioned upon the posting of a supersedeas bond." *Id.* at 222–23 (citation and internal quotation marks omitted).

Finally, in *Grand River Dam Authority v. Eaton*, 803 P.2d 705, 709 (Okla. 1990), the Oklahoma Supreme Court overruled prior precedent in holding that failure to post a supersedeas bond is "immaterial" to the question of whether an appellant waives the right to appeal by paying the judgment. The *Eaton* court cited with approval *Hayes v. Nourse*, 14 N.E. 508, (N.Y. 1887), in which the New York Court of Appeals stated:

> "The defendant's practice in paying the judgment before appealing from it is not to be condemned. It is rather to be encouraged. A party who recovers at the trial term . . . might fairly be deemed entitled to the fruits of his action without further delay. The law, however, allows [an] appeal; but, although it is taken, the successful party may nevertheless enforce his judgment by execution, and so collect its award, unless the defeated party secures its ultimate payment by a deposit of money or an undertaking. Why may he not simplify the matter by placing the funds at once in the hands of the party who, if the appeal fails, will be ultimately entitled to them? By so doing he will save the

> costs of execution, and do no harm to his creditor. We think he should not, by a temporary submission to the decision of the court, be placed in a worse position than if he awaited execution and settled it with sheriff's fees."

*Id.* (quoting *Hayes*, 14 N.E. at 508). The *Eaton* court took the opportunity to "clear up any confusion" and held that an appeal is not waived by payment of judgment unless the payment by a judgment debtor "is shown to be made with the intent to compromise or settle the matter and, thus, to abandon the right to appeal or the payment in some way . . . makes relief impossible in case of reversal." *Eaton*, 803 P.2d at 707, 709.

There are also cases that consider the impact of a mere threat of institution of enforcement proceedings on appellate waiver. In *Highland Church of Christ v. Powell*, 640 S.W.2d 235, 236–37 (Tex. 1982), the Texas Supreme Court held that payments made "to prevent the taxing authorities from taking steps to collect the taxes before the appeal was determined" were involuntary, even though the taxing authorities had not actually attempted execution on the judgment at the time of payment. The court reasoned that the judgment debtor was "justifiably anxious to avoid the penalties and interest which would accrue while the case was on appeal." *Powell*, 640 S.W.2d at 237. Also, in this case, it was noted that "it would have been very embarrassing for this religious institution to have execution issued against it." *Id.*; *see also Reitano v. Yankwich*, 237 P.2d 6, 8 (Cal. 1951) (attorney's threat to levy execution unless the judgment was paid amounted to coercion as to render payment involuntary); *Carlucci v. Duck's Real Estate, Inc.*, 257 S.E.2d 763, 765 (Va. 1979) (payment following issuance of execution on judgment and filing of garnishment was involuntary).

**C. Federal Caselaw on Appellate Waiver.** The federal approach to appellate waiver is well established and unambiguous. In *Dakota County v. Glidden,* 113 U.S. 222, 224, 5 S. Ct. 428, 429, 28 L. Ed. 981, 982 (1885), the United States Supreme Court considered whether an appeal becomes moot when the parties enter into a settlement following judgment. According to the Supreme Court, "[t]here can be no question that a debtor against whom a judgment for money is recovered, may pay that judgment, and bring a writ of error to reverse it, and if reversed can recover back his money." *Glidden,* 113 U.S. at 224, 5 S. Ct. at 429, 28 L. Ed. at 982. The Supreme Court observed that a party who "merely submitted to perform the judgment of the court" does not lose his right to seek reversal of that judgment on appeal. *Id.* When an agreement follows judgment, however, whether the cause of action has been extinguished "must stand or fall on the terms of the compromise." *Id.* at 225, 5 S. Ct. at 429, 28 L. Ed. at 982. The *Glidden* rule remains good federal law today. *See Cahill v. N.Y., New Haven, & Hartford R.R.,* 351 U.S. 183, 184, 76 S. Ct. 758, 759, 100 L. Ed. 1075, 1077 (1956); *Dale M. ex rel. Alice M. v. Bd. of Educ.,* 237 F.3d 813, 815 (7th Cir. 2001).

**D. Analysis of Whether Payment of Judgment Under Threat of Execution Waives Right of Appeal.** After reviewing the trend in our own cases and the authorities from other jurisdictions, we conclude that the approach in *Glidden* is the best approach. The *Glidden* rule is clearer than other approaches and in most cases will not thrust the court into a multifactor voluntariness determination that lacks standards and produces conflicting results. We think that in the modern economic and business environment, a party ought to be able to avoid unnecessary costs and expenses by simply paying a judgment without losing a right to appeal.

We also think that when a judgment debtor elects to avoid the hassles resulting from execution, there should be no inference that the party does not intend to prosecute an appeal. The payment of a judgment under threat of execution is not freely given in any realistic way, but it is given under the coercion of law arising from the assertion of creditors' remedies. A decision to pay a judgment when faced with the unattractive choice of allowing the disruption to its business affairs resulting from creditors' remedies cannot be considered a voluntary choice that cuts off important legal rights.

We are also persuaded by the line of cases holding that the mere availability of a supersedeas bond or other mechanism to stay enforcement does not mean that payment of a judgment results in waiver of the right to appeal. *See Lowrance*, 682 So. 2d at 222–23; *Eaton*, 803 P.2d at 709. This approach is consistent with our holding in *Hegtvedt* and the trend in our caselaw away from a rigid application of the appellate waiver doctrine. We agree with the New York Court of Appeals in *Nourse* that payment of a judgment during the pendency of appeal is to be encouraged, not condemned. *See Nourse*, 14 N.E. at 508.

In light of the above review, we hold that the payments made by Security in this case do not cut off the right to appeal. We overrule *Manning* and any other caselaw to the contrary.

### III. Discussion of Merits of Summary Judgment.

**A. Introduction.** Because we have determined that Security has not waived its appeal, we now proceed to consider the merits of the district court's entry of summary judgment in favor of Peoples on its conversion claim. Security claims that the trial court erred in granting summary judgment because there was a triable issue on the question of whether the cattle were owned by Gilley, and thereby subject to Peoples'

security interest, or owned jointly by Gilley and Wilson, in which case, according to Security, Peoples' security interest would not attach. Security also asserts that even if Peoples had a security interest in the cattle, it waived its security interest through the course of conduct between Peoples and its borrower, Gilley.

**B. Standard of Review.** With respect to the district court's grant of summary judgment, our review is for errors at law. Iowa R. App. P. 6.907; *Hlubek v. Pelecky*, 701 N.W.2d 93, 95 (Iowa 2005). Under our caselaw, the moving party has the burden of showing facts that entitle it to summary judgment. *Teague v. Mosley*, 552 N.W.2d 646, 648 (Iowa 1996); *Farm Bureau Mut. Ins. Co. v. Milne*, 424 N.W.2d 422, 423 (Iowa 1988); *Steinbach v. Cont'l W. Ins. Co.*, 237 N.W.2d 780, 783 (Iowa 1976). Once that burden is met, the nonmoving party must present competent evidence to generate a genuine issue of material fact. Iowa R. Civ. P. 1.981(5); *Hoefer v. Wis. Educ. Ass'n Ins. Trust*, 470 N.W.2d 336, 339 (Iowa 1991). "Speculation is not sufficient to generate a genuine issue of fact." *Hlubek*, 701 N.W.2d at 96.

**C. Adequacy of Description in UCC Financing Statement.**

1. *Position of the parties.* Security asserts that the security agreement between Peoples and Gilley did not provide a security interest in the cattle involved in this case. Security argues that because the language of the Peoples/Gilley security agreement did not expressly apply to jointly owned property, a security interest does not attach to such property. *See In re Hunerdosse*, 85 B.R. 999, 1005 (Bankr. S.D. Iowa 1988).

Security then asserts that there was a substantial factual question as to whether the cattle in this case were jointly owned by Gilley and Wilson. Security argues it offered evidence that the relationship between

Gilley and Wilson was a joint venture and that the cattle purchased with funds borrowed from Security were owned by the joint venture and not by Gilley. According to Security, if the cattle were owned by the joint venture, Peoples' security interest would not attach.

Peoples counters that on the undisputed facts the relationship between Gilley and Wilson was not a joint venture. Relying largely on our decision in *Pay-N-Taket, Inc. v. Crooks*, 259 Iowa 719, 145 N.W.2d 621 (1966), Peoples claims that a joint venture is not present when, as here, there is no partnership name, no partnership books or tax returns, no sharing of profits and losses, and no control over management. *See Pay-N-Taket*, 259 Iowa at 724–25, 145 N.W.2d at 625.

In any event, even if the relationship between Gilley and Wilson could be characterized as a joint venture, Peoples maintains that the cattle were still owned by Gilley. In support of its argument, Peoples cites a section of the Uniform Partnership Act, Iowa Code section 486A.204(4) (2009), which provides that property acquired in the name of one or more partners without an indication in the instrument transferring title of the person's capacity as a partner and purchased without use of partnership assets, is presumed to be separate property. Peoples emphasizes that the sales documentation indicates in this case that the purchaser of the cattle was Gilley, not some kind of joint venture or partnership.

In the alternative, Peoples argues that, even if the cattle were jointly owned property, it has a security interest in Gilley's interest in the joint property and that, upon sale of the cattle, its security interest attaches to Gilley's share of the proceeds.

2. *Ownership of cattle.* The parties concentrate their fire on the existence of a triable issue on the question of whether the relationship

between Gilley and Wilson amounted to a joint venture. Under our law, a joint venture is very similar to a partnership. *Johanik v. Des Moines Drug Co.*, 235 Iowa 679, 685–86, 17 N.W.2d 385, 389 (1945). The main difference between a partnership and a joint venture is that a joint venture exists to accomplish a specific goal or end, where a partnership ordinarily has broader scope. *Id.* Generally, the same substantive law applies to joint ventures as applies to partnerships. *Id.*; *see also Brewer v. Cent. Constr. Co.*, 241 Iowa 799, 807, 43 N.W.2d 131, 136 (1950).

Whether a joint venture exists is a mixed question of fact and law. Determination of the characteristics of the relationship is a question of fact. Determination of the consequences of the proven facts is a matter of law. We have held that "no particular form of expression or formality of execution" is necessary to establish a joint venture, which may be implied "in whole or in part from the conduct of the parties." *Pay-N-Taket*, 259 Iowa at 724, 145 N.W.2d at 625.

We have characterized a joint venture in a number of ways. In *Brewer*, we said:

> A joint adventure is defined as an association of two or more persons to carry out a single business enterprise for profit; also as a common undertaking in which two or more combine their property, money, efforts, skill or knowledge.

*Brewer*, 241 Iowa at 806, 43 N.W.2d at 136. Similarly, in *Pay-N-Taket* we stated:

> A partnership or joint adventure, a limited partnership, is usually a contract where two or more persons place their money, labor and skill in some business to be carried on by the partnership, with an agreement to divide the profits and share the losses.

*Pay-N-Taket*, 259 Iowa at 724, 145 N.W.2d at 625.

There is, perhaps, some question as to whether each and every feature of the above definitions must be shown in every case. *See Farm-*

*Fuel Prods. Corp. v. Grain Processing Corp.*, 429 N.W.2d 153, 158 (Iowa 1988). And, it is certainly true that a mere showing of sharing in profits alone is not necessarily enough to establish a joint venture. Nevertheless, a gateway requirement of a joint venture is a showing that the participants have agreed to share in the profits and losses. *See Skemp v. Olansky*, 249 Iowa 1, 7–8, 85 N.W.2d 580, 584 (1957) (joint venture not present where no showing of sharing of profits and losses and only assistance in obtaining a loan); *Berry Seed Co. v. Hutchings*, 247 Iowa 417, 426, 74 N.W.2d 233, 239 (1956) (while participation in profits does not alone indicate partnership, mere payment as a percentage of profits, where defendant does not share in losses, does not establish joint venture); *Brewer*, 241 Iowa at 806, 43 N.W.2d at 136 (stating general rule that joint venture usually requires an agreement, express or implied, to share losses). Where each participant does not share an upside and downside risk in profits and losses, we hold that a joint venture is not present.

In this case, it is undisputed that Wilson had no right to share in the profits of the cattle raising activities. Much as a real estate agent receives commissions on the sale of property, Wilson received his commissions on the purchase of cattle. He also received payment when the cattle were sold to Swift & Co. While Wilson could have lost money in the event that he was called upon to pay outstanding balances of the loan with Security, this potential liability is the result of his relationship with the lender and not his relationship with Gilley. We conclude, therefore, that on the undisputed facts a joint enterprise was not present.

3. *Ownership notwithstanding lack of joint venture.* Our holding that a joint venture was not present, however, is not the end of the

matter. If Gilley owned the cattle outright, the parties seem to agree that Peoples' security interest would attach to the cattle in question. If, however, the cattle were owned jointly by Gilley and Wilson, the issue becomes more problematic. The question thus arises, when two persons are coborrowers on a loan from a lending institution and the proceeds are used to buy property, whether the participants are joint owners of the property.

The documentation on the loans obtained from Security indicates that Gilley and Wilson were both listed as borrowers. Also, they both signed security agreements in connection with the loan. The mere fact that Wilson was a coborrower with respect to the underlying debt, however, is not determinative on the question of ownership of cattle purchased with the loan proceeds. Merely cosigning a note does not necessarily establish an ownership interest in the property obtained by loan proceeds. *See In re Easton*, 883 F.2d 630, 636 (8th Cir. 1989) (stating record did not establish ownership based on cosigning of note); *Ingersoll v. Mason*, 155 F. Supp. 497, 507 (D.C. Ark. 1957) (stating cosigning note to finance purchase of car does not establish ownership or right of control). The question of whether a coborrower has an ownership interest in property obtained with loan proceeds depends upon the parties' intent. *See In re Fischel*, 103 B.R. 44, 47 (Bankr. N.D.N.Y. 1989); *cf. In re Estate of Liike*, 776 N.W.2d 662, 665 (Iowa Ct. App. 2009) (intent of parties determines whether property is held in partnership). When Wilson agreed to sign the loan documentation, was he doing it as an accommodation to Gilley, or instead as a coborrower who had a joint interest in the funds that traveled through to establish a joint property interest in the cattle purchased with the funds?

Gilley repeatedly stated in a sworn statement offered by Peoples in support of its motion for summary judgment that he was the owner of the cattle. Peoples' evidence further showed that the money borrowed from Security was placed in an account at Security owned solely by Gilley. When cattle were purchased by Wilson, the invoices stated on their face that Gilley was the purchaser. The cattle were delivered to Gilley's premises. Gilley honored the invoices by checks sent to the auction houses drawn on his personal account. The invoices included not only the price for the purchase of cattle, but a commission to be paid to Wilson in connection with the transactions. When the cattle were sold, Gilley was entitled to the proceeds, subject, of course, to any outstanding security interests. These undisputed facts all suggest that Gilley was the owner of the cattle.

Security presents an affidavit from Wilson resisting summary judgment. In the affidavit, Wilson does not directly contest Gilley's assertion that Gilley owned the cattle. Wilson states that he "agreed to be personally responsible for all loans for the purchase of cattle," made "arrangements for the purchase of cattle," and he claimed an "investment" in the cattle, apparently based upon his potential liability on the underlying debt. He does not, however, claim that the cattle were owned jointly by himself and Gilley. Instead, the thrust of his affidavit is that the relationship amounted to a joint venture, an assertion that we have already rejected.

Further, Peoples presented testimony by Wilson in a prior bankruptcy proceeding involving Gilley and his wife where Wilson flatly stated that he did not have an ownership interest in the cattle, that his arrangement with Security was one of helping Gilley get financing to buy the cattle, and that his benefit was the commission he would earn on

cattle purchases.[2]   Against the backdrop of this unqualified testimony, we do not find that the evasive and guarded statements in the Wilson affidavit create a genuine issue of material fact on the ownership issue.

In resisting summary judgment, Security offers two additional pieces of evidence in its attempt to create a triable issue of fact on the question of ownership of the cattle.   First, Security cites sales agreements signed by Wilson where the signature line identifies the signer as "purchaser or agent."   Second, Security notes that Wilson, after he became concerned that Gilley was not applying proceeds from cattle sold to the loan upon which Wilson was a coborrower, directed buyers of cattle to make checks out to Wilson or Security.

Although it is true that the signature line on the sales agreements for "purchaser or agent" were signed by Wilson, the documents identify Gilley as the purchaser on the top of the front page of the invoices.  The undisputed facts showed that Wilson was to purchase the cattle and be paid a commission on the purchases.   Gilley in his sworn statement stated that Wilson signed such documents as his agent.  Wilson did not contradict this factual assertion in his affidavit or in his testimony in the Gilley bankruptcy proceeding.   As a result, the fact that Wilson signed invoices as "purchaser or agent" does not establish a genuine issue of material fact.   Under the undisputed evidence, he signed the invoices as agent.

---

[2]Prior testimony by a nonparty may be considered in support or opposition to a motion for summary judgment as a further affidavit under Iowa Rule of Civil Procedure 1.981.  *Rohlin Constr. Co. v. Lakes, Inc.*, 252 N.W.2d 403, 405 (Iowa 1977).  The test is whether the offered evidence, if given in the form of testimony at trial, would be admissible.  *See Gustason v. Ne. Nat'l Bank*, 486 S.W.2d 596, 599 (Tex. Civ. App. 1972) (stating test is whether offered evidence, if given in the form of testimony from the witness stand, would be admissible); *see also Saghin v. Romash*, 258 N.E.2d 581, 583 (Ill. App. Ct. 1970) (same).

Finally, although Security offered evidence that Wilson instructed buyers to make out checks to Wilson or to Security, such action does not make Wilson an owner of the underlying cattle. It established only that Wilson, as a selling agent with apparent authority, was able to instruct buyers regarding the manner of payment. As a result, Security has not raised a genuine issue of material fact on the ownership question based on this additional evidence.

### D. Waiver by Course of Conduct.

1. *Position of Security.* Assuming Peoples' security interest does attach to the cattle in question, Security claims that Peoples waived its security interest because Peoples must have known that Gilley was selling cattle and applying the proceeds to pay down obligations to another creditor. *See Folkers v. Britt*, 457 N.W.2d 578, 581–82 (Iowa 1990). Knowledge of such transactions, according to Security, can be used to establish waiver by course of conduct. *See Perkins v. Farmers Trust & Sav. Bank*, 421 N.W.2d 533, 536 (Iowa 1988). Security further claims that by waiving its preferred security position in its collateral, Peoples also waived its rights in the proceeds arising from the sale of the collateral. In support of its position, it cites *C & H Farm Service Co. of Iowa v. Farmers Savings Bank*, 449 N.W.2d 866, 875 (Iowa 1989), where we stated: "[W]here a secured party waives its security interest in collateral under the course of dealing waiver doctrine, the derivative security interest in proceeds of the collateral should be deemed waived to the same extent."

Security supports its claims by noting that Peoples in September 2007 informed Gilley that Peoples would not extend additional credit for the purchase of feeder cattle. Yet, Peoples visited Gilley's lot in 2007 and 2008 and would have had an opportunity to view the cattle, which

Wilson claims were different in appearance and segregated from cattle financed by Peoples. Further, Security claims Peoples must have known that sales of cattle were occurring over a two-year period with proceeds being deposited in another bank. This is so, Security argues, because the loan balance on the Gilley line was not paid down during a period even though Gilley on his 2007 tax return showed gross receipts from cattle sales of $444,285.

2. *Position of Peoples.* Peoples claims the case involves a different legal framework than that offered by Security. Peoples maintains that there is a distinction between waiver of rights in collateral and waiver of rights in proceeds. In support of its position, Peoples cites *Humboldt Trust & Savings Bank v. Entler*, 349 N.W.2d 778 (Iowa Ct. App. 1984). In *Humboldt*, the court of appeals noted that a secured creditor may release its lien in collateral and retain a security interest in the identifiable proceeds. *Humboldt*, 349 N.W.2d at 782. Peoples maintains that the language cited by Security in *C & H Farm Service* is inaccurate and is in any event dicta. According to Peoples, its argument is strengthened by a change in the Iowa version of the UCC enacted in 2001, which now clearly distinguishes between waivers with respect to rights in collateral and waiver of rights in proceeds. *See* Iowa Code § 554.9315(1)(*a*)–(*b*).

On the issue of whether Peoples waived its right in the proceeds, Peoples argues that under *C & H Farm Service*, a creditor must have "actual knowledge" of the transaction giving rise to a waiver of a right. *C & H Farm Serv. Co.*, 449 N.W.2d at 873.

In support of its legal position, Peoples notes that Security has offered no "direct" evidence that Peoples had knowledge of cattle sales in which the proceeds were deposited with Security. Jamie Brant, the responsible loan officer at Peoples, testified that he had no knowledge of

the fact that Gilley was selling his cattle and depositing the proceeds elsewhere. Brant testified that he was aware of the Security UCC statement, but believed it related to cattle Gilley received as payment for custom feeding. Brant testified that Gilley advised him that these cattle, some two hundred head, were to be sold in the summer or fall of 2008 for application on the debt due Peoples. According to Peoples, any waiver of security interest in the proceeds of the sale of cattle requires actual knowledge of the sale or actual knowledge of the use of the proceeds inconsistent with Peoples' security interest.

3. *Existing Iowa legal framework.* We begin with a review of the provisions of the Iowa version of the Uniform Commercial Code (IUCC) that deal with the question of whether a lender may waive its perfected security interest in collateral or identifiable proceeds through a course of dealing between the lender and the borrower. Prior to 2001, Iowa had adopted section 9-306(2) of the Uniform Commercial Code, which provided:

> (2) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement *or otherwise*, and also continues in any identifiable proceeds including collections received by the debtor.

U.C.C. § 9-306(2), 3B U.L.A. 33–34 (2002) (emphasis added) (former U.C.C. article 9); *see also* Iowa Code § 554.9306(2) (1999). The thrust of former section 9-306(2) was that after sale a security interest continues in the collateral and in the proceeds, unless the sale was either authorized (1) by the secured party in the security agreement, or (2) "otherwise." *See* U.C.C. § 9-306(2).

There was a split in authority regarding whether the "otherwise" language should be interpreted to allow a course of dealing between a

lender and borrower to override an express requirement in the security agreements that a borrower first obtain *written* consent before selling the collateral. *See, e.g., Garden City Prod. Credit Ass'n v. Lannan*, 186 N.W.2d 99, 104 (Neb. 1971) (no waiver of express provision of security agreement through course of conduct), *overruled by Farmers State Bank v. Farmland Foods, Inc.*, 402 N.W.2d 277, 282 (Neb. 1987); *Clovis Nat'l Bank v. Thomas*, 425 P.2d 726, 730 (N.M. 1967) (course of conduct could authorize sale notwithstanding requirement of written consent in security agreement); *see generally* Janet Fairchild, Annotation, *What Constitutes Secured Party's Authorization to Transfer Collateral Free of Lien Under UCC § 9-306(2)*, 37 A.L.R.4th 787 (1985).

In *Lisbon Bank & Trust Co. v. Murray*, 206 N.W.2d 96, 99 (Iowa 1973), we held that a course of dealing between the debtor and the borrower could give rise to authorization to sell cattle free of the security interest where the security agreement did not contain a requirement of written consent. We also held in *Lisbon Bank* that the failure of a party to live up to a condition that it account to the secured party for the proceeds did not affect the implied authorization to sell. *Lisbon Bank*, 206 N.W.2d at 99. In *Hedrick Savings Bank v. Myers*, 229 N.W.2d 252, 256 (Iowa 1975), we joined the *Clovis* line of cases in deciding that a course of conduct could authorize sale of collateral in contradiction to an express prohibition in the security agreement.

The principles of *Lisbon* and *Hedrick* have been followed in a series of cases. *See, e.g., First State Bank v. Shirley Ag Serv., Inc.*, 417 N.W.2d 448, 453 (Iowa 1987) (failure of seller to abide by agreement with lender does not affect rights of purchaser to collateral); *Ottumwa Prod. Credit Ass'n v. Keoco Auction Co.*, 347 N.W.2d 393, 396 (Iowa 1984) (failure of secured party to remit proceeds does not vitiate authority to sell hogs

established through course of dealing). The theory in these cases is that an innocent third party should not bear the loss resulting from inadequate collection practices of the secured party. *Keoco*, 347 N.W.2d at 397; *Lisbon Bank*, 206 N.W.2d at 99. We have further noted that a lender may reassert previously waived rights by giving reasonable notice to the debtor that the creditor intends to do so. *See FS Credit Corp. v. Troy Elevator, Inc.*, 397 N.W.2d 735, 738 (Iowa 1986).

We revisited the law of secured interests in *C & H Farm Service*. In *C & H Farm Service*, the lender learned of the sale but did not veto it. *C & H Farm Serv. Co.*, 449 N.W.2d at 872. Instead, the lender advised the debtor to get the lender's name on the check resulting from the sale. *Id.* Although the debtor proceeded with the sale, the debtor did not follow the lender's instructions. *Id.* Instead of instructing the buyer to make the check out to the lender, the debtor obtained the proceeds and deposited the funds in an overdrawn bank account. *Id.* at 875.

In determining whether the lender waived its security interest in the collateral through its course of dealings with the debtor, we observed "a secured party must have actual knowledge of its debtor's sales of collateral without prior written consent before the secured party may be deemed to have waived its right to such consent by course of dealing." *Id.* at 873. We concluded under the facts of the case that the lender knew of the sale. *Id.* The fact that the debtor did not take steps to ensure that the proceeds were paid to the lender did not affect the waiver of the bank's security interest in the collateral. *Id.*

We next turned to the question of whether the creditor continued to have a security interest in the proceeds. We noted that because the debtor's bank account was overdrawn, there were not identifiable proceeds that might be subject to the creditor's security interest. *Id.* at

876.  We also observed, in apparent dicta, that ordinarily, when the creditor waives its security interest in the collateral, the derivative security interest in the proceeds is also waived.  *Id.* at 875.  This dicta was inconsistent with the earlier court of appeals decision in *Humboldt,* which was not cited in the opinion.

In 2000, the legislature revised the IUCC.  In place of Iowa Code section 554.9306(2), the legislature enacted Iowa Code section 554.9315.  *See* 2000 Iowa Acts ch. 1149, §§ 26, 35 (codified at Iowa Code §§ 554.9306, .9315 (Supp. 2001)).  The amendment adopted the revisions made in 2000 of Article 9 of the Uniform Commercial Code.  *See* U.C.C. § 9-315, 3 U.L.A. 289–90 (2010); H.F. 2513, Explanation, 78th G.A., Reg. Sess. (Iowa 2000) (stating "[t]his bill adopts revisions to Article 9 of the Uniform Commercial Code . . . as proposed by the national conference of commissioners on uniform state laws"); H.F. 2513, Fiscal Note, 78th G.A., Reg. Sess. (Iowa 2000) (same).  This provision states, in relevant part, except as otherwise specifically provided in exceptions not applicable here:

> *a.*  a security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and
> *b.*  a security interest attaches to any identifiable proceeds of collateral.

Iowa Code § 554.9315(1)(*a*)–(*b*) (2009).

The new UCC provision allows a lender to "authorize[] the disposition [of collateral] free of the security interest," but when such authorization occurs, a security interest attaches "to any identifiable proceeds of the collateral."  *Id.*  The new provision clearly separates a security interest in the *collateral,* which is addressed under subsection

(*a*), from a security interest in *identifiable proceeds*, which is addressed by subsection (*b*). The clear import of the legislative action is that waiver of rights in collateral does not necessarily mean waiver of rights in the proceeds.

4. *Resolution of legal issues.* The parties raise two legal issues that require resolution in determining this appeal. The first legal issue is whether the waiver of a secured interest in collateral necessarily results in a similar waiver of the creditor's interest in the proceeds. In short, we must resolve whether the approach of the court of appeals in *Humboldt* is correct, or whether the dicta in *C & H Farm Service* is the better approach.

A second legal issue is the standard to be applied in determining whether a creditor has waived rights in proceeds. Must a party challenging creditor's rights on waiver grounds show that the creditor had "actual knowledge" of the application of identifiable proceeds in a fashion contrary to the creditor's interests? Or, can waiver arise on a lesser showing?

On the first issue, we conclude that Peoples has the better argument. It is true that in *C & H Farm Service* we used language that seemed to imply that a creditor who waived rights in collateral also waived rights in proceeds. *See C & H Farm Serv. Co.*, 449 N.W.2d at 875. The language, however, was dicta. We also recognize that there is some authority supporting the approach in *C & H Farm Service. See United States v. Sec. State Bank*, 686 F. Supp. 733, 736 (N.D. Iowa 1988) (citing general rule that consent to sale through normal sales channels rather than through UCC enforcement procedure waives right to collateral and proceeds). The majority of courts and commentators has accepted the contrary view, however, and maintain that a secured party who

authorizes the disposition of collateral free of the security interest continues to have a security interest in the identifiable proceeds of the collateral, unless, of course, the secured party relinquishes or waives the security interest in the proceeds as well. *See, e.g.*, *In re Bumper Sales, Inc.*, 907 F.2d 1430, 1440 (4th Cir. 1990); *Dixie Ag Supply, Inc. v. Nelson*, 500 So. 2d 1036, 1040 (Ala. 1986); *Producers Cotton Oil Co. v. Amstar Corp.*, 242 Cal. Rptr. 914, 922 (Ct. App. 1988); *Vacura v. Haar's Equip., Inc.*, 364 N.W.2d 387, 392 (Minn. 1985); *Farmers & Merchants Nat'l Bank v. Sooner Coop., Inc.*, 766 P.2d 325, 329 (Okla. 1988); *Dry Canyon Farms, Inc. v. U.S. Nat'l Bank of Or.*, 735 P.2d 620, 623 (Or. Ct. App. 1987); *Cent. Wash. Bank v. Mendelson-Zeller, Inc.*, 779 P.2d 697, 700 (Wash. 1989); *see also* U.C.C. § 9-315 cmt. 2, 3 U.L.A. 290–91; 9B Frederick H. Miller & Neil B. Cohen, *Hawkland UCC Series § 9-315:2[Rev]* (2008) ("Regardless of whether the disposition of the collateral is authorized, the security interest continues in identifiable proceeds unless the secured party also either relinquishes or waives the security interest in the proceeds."); D. Fenton Adams, *Sales of Personal Property As Secured Transactions Under Article 9 of the Uniform Commercial Code*, 31 U. Ark. Little Rock L. Rev. 1, 62 (2008) (stating under former Article 9 secured interest in proceeds served as substitute collateral if the secured party authorized disposition of the collateral); William Stoddard, *Tracing Principles in Revised Article 9 § 9-315(B)(2): A Matter of Careless Drafting, or An Invitation to Creative Lawyering?*, 3 Nev. L.J. 135, 136–37 (2002) (noting secured party who authorizes sale of collateral retains secured interest in proceeds).

Our position is reinforced by the recent legislative change to the IUCC. The amendment now reflected in the language of Iowa Code section 554.9315 demonstrates a decoupling of waiver of interest in

collateral from waiver of interests in proceeds. *See* U.C.C. § 9-315 cmt. 2, 3 U.L.A. 290–91 (stating "[i]n many cases, a purchaser or other transferee of collateral will take free of a security interest, and the secured party's only right will be to proceeds").

On the question of appropriate legal standard required to establish waiver, we do not believe actual knowledge of the details of a particular transaction is always required, particularly when through a course of conduct a lender has knowingly waived its security interest through acquiescence in transactions of similar scope and import. We note that the language in *C & H Farm Service* suggesting that actual knowledge was required was only a proposition advanced for purposes of argument rather than a holding of the court. We do believe, however, that a waiver can be established only upon showing that the creditor knowingly and intentionally waived his rights in the proceeds. *See Churchhill Bus. Credit, Inc. v. Pac. Mut. Door Co.*, 49 F.3d 1334, 1337 (8th Cir. 1995); *Vermillion Cnty. Prod. Credit Ass'n v. Izzard*, 249 N.E.2d 352, 354 (Ill. App. Ct. 1969); *N. Cent. Kan. Prod. Credit Ass'n v. Wash. Sales Co.*, 577 P.2d 35, 41 (Kan. 1978); *Hauenstein & Bermeister, Inc. v. Met-Fab. Indus., Inc.*, 320 N.W.2d 886, 892 (Minn. 1982); *Bank of E. Or. v. Griffith*, 792 P.2d 1210, 1213 (Or. Ct. App. 1990); *Cent. Wash. Bank v. Mendelson-Zeller, Inc.*, 779 P.2d 697, 701 (Wash. 1989). Further, in order to establish implied waiver by conduct, there must exist clear, unequivocal, and decisive conduct demonstrating intent to waive. *Cent. Wash. Bank*, 779 P.2d at 701; *see also Vogel v. Carolina Int'l, Inc.*, 711 P.2d 708, 711–12 (Colo. App. 1985); *Fleming v. Carroll Publ'g Co.*, 621 A.2d 829, 833 (D.C. 1993); *Washburn v. Union Nat'l Bank & Trust Co. of Joliet*, 502 N.E.2d 739, 742 (Ill. App. Ct. 1986); *Five Points Bank v. Scoular-Bishop Grain Co.*, 350 N.W.2d 549, 552 (Neb. 1984); Russell L. Wald,

Annotation, *Secured Transactions—Waiver of Security Interest*, 29 Am. Jur. Proof of Facts 2d 711, 731 (1982) (stating "to constitute waiver other than by express agreement there must be unequivocal acts or conduct evincing an intent to waive, inconsistent with any other intention"). It is not enough to show that a creditor was negligent or should have known that its security position was being undermined by actions of a debtor. Further, even when a creditor has knowingly and intentionally waived its rights in the collateral, it may rescind its waiver by conduct inconsistent with it. *FS Credit Corp.*, 397 N.W.2d at 738.

5. *Application of law to this case.* For the sake of argument, it may be assumed that until Peoples sent its notices pursuant to the Food Security Act on March 30 and April 1, 2008, Peoples waived its security interest in cattle sold to third parties. The critical issue posed in this case, however, is not whether the bank surrendered its security interest in the collateral. The critical question is whether the bank surrendered its security interest in the proceeds.[3] The only question before us is whether, on the summary judgment record, Security generated a fact issue on the question of whether Peoples knowingly and intentionally waived its interest in the proceeds of the sale of Gilley's cattle through clear, unequivocal, and decisive conduct. *See Cent. Wash. Bank*, 779 P.2d at 701.

There is circumstantial evidence to suggest that while Peoples did not know of specific sales of cattle, it must have had some inkling that Gilley was selling cattle subject to its security interest. Further, Brant was told by Gilley in the summer of 2008 that Gilley planned to sell

---

[3]No claim has been made on appeal that the funds loaned by Security were perfected purchase money security interests or that the funds sought to be recovered in this case were not "identifiable proceeds."

cattle and forward the proceeds to Peoples. Peoples did nothing to veto the sale.

But Peoples offered evidence indicating that it had no knowledge of the sales and the diversion of proceeds to another bank. While it is arguable that Peoples, despite its denials, might have had knowledge of some cattle sales, there is no reason to believe that Peoples had knowledge that Gilley was forwarding proceeds in which Peoples had a security interest to another bank. The record indicates that Peoples became aware of a UCC filing by Security, but this filing was explained away by Gilley as related solely to cattle on his lot that were being custom fed. While the actions of Peoples may not have been a model of diligence, and even rather gullible, there is no triable issue on the question of an intentional and knowing waiver of Peoples' interest in the proceeds through clear, unequivocal, and decisive conduct. As a result, we conclude that the district court did not err in granting summary judgment to Peoples.

**IV. Conclusion.**

In summary, we conclude Security did not waive its right to appeal by paying the judgment under the circumstances presented in this case. Proceeding to the merits, however, we conclude that the district court properly determined that Peoples was entitled to summary judgment on its underlying conversion claim against Security. We therefore vacate the decision of the court of appeals and affirm the judgment of the district court.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**