# IN THE SUPREME COURT OF IOWA

No. 14–0692

Filed January 22, 2016

**DARLA LEGG** and **JASON T. LEGG,** on Behalf of Themselves and All Persons Similarly Situated,

    Appellees,

vs.

**WEST BANK,**

    Appellant.

---

Appeal from the Iowa District Court for Polk County, Bradley McCall, Judge.

Defendant applied for interlocutory appeal from a district court ruling denying its two motions for summary judgment. **DECISION OF DISTRICT COURT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Wade R. Hauser III, Jason M. Craig, Lindsay A. Vaught, and Michael J. Streit of Ahlers & Cooney, P.C., Des Moines, for appellant.

Ann E. Brown-Graff, Brad J. Brady, and Matthew L. Preston of Brady Preston Brown PC, Cedar Rapids, Joseph R. Gunderson of Gunderson, Sharp & Walke, Des Moines, and Thomas J. Duff of Duff Law Firm, P.L.C., Des Moines, for appellees.

Robert L. Hartwig, Johnston, for amicus curiae Iowa Bankers Association.

Emily Anderson of RSH Legal, Cedar Rapids, for amici curiae Iowa Association for Justice, Iowa Citizen Action Network, and National Consumer Law Center.

**ZAGER, Justice.**

In this interlocutory appeal, we are asked to determine whether the district court properly denied the bank's two motions for summary judgment. The plaintiffs filed a multiple-count consumer class action lawsuit against the bank challenging the one-time nonsufficient funds (NSF) fees it charged when the plaintiffs used their debit cards to create overdrafts in their checking account. For the reasons set forth below, we find that the district court erred in denying the motions for summary judgment except as to the good-faith claim involving the sequencing of the overdrafts. The decision of the district court is affirmed in part, reversed in part, and remanded for further proceedings.

### I. Background Facts.

West Bank is a state-chartered Iowa bank. Plaintiffs Darla and Jason Legg are former customers of West Bank. They opened a joint checking account with West Bank on November 26, 2002. They closed their last account with West Bank in April 2013. The claims arising in this case, discussed in detail below, arise out of the payment of overdrafts and resulting NSF fees charged by West Bank.

West Bank issues bank cards to its customers. Customers use their bank cards in one of two ways: automatic teller machine withdrawals (ATM withdrawals) or point of sale purchases (POS purchases). Customers may also make electronic payments using their West Bank accounts that are processed in the same way as ATM withdrawals and POS purchases. All three of these transactions are classified as "bank card transactions." When customers are issued a bank card, they receive a "Deposit Account Agreement" (Agreement). The Agreement provides that West Bank "shall have an obligation to

Depositor to exercise good faith and ordinary care in connection with each account."

When a customer of West Bank uses his or her bank card to begin a transaction, an electronic request is sent to Shazam. Shazam in turn sends an electronic request to Fiserv. Fiserv is a banking platform that processes payment requests for West Bank. Based on the customer balance available at the time the electronic request is made, Fiserv either denies or allows the transaction. The district court summarized what happens next as follows:

> When a customer uses a Bank Card, once the transaction is approved at the point of sale the bank is required to pay the transaction when presented, even if there are not sufficient funds in the account by the time the transaction is posted to the account. Such posting typically occurs one to three days after the original transaction.
>
> If West Bank is called upon to pay a Bank Card transaction when there are insufficient funds in the account, the bank advances sufficient money to cover the amount by which the account is short, and assesses a non-sufficient funds (NSF) fee. Those advances are automatically deducted from the customer account and repaid to the bank the next time a deposit sufficient to cover the advances is made to the account.[1]

Debit card transactions are thus classified as "force-pay" transactions. Once they are authorized by Fiserv, West Bank is required to pay them, even if the customer's account has insufficient funds at the time the transaction is processed. These transactions may be presented for payment up to three days after the transaction is approved. The decision to pay the bank card transaction is made separately from the

---

[1]West Bank disputes whether the services are automated. However, since facts are viewed in the light most favorable to the nonmoving party in a motion for summary judgment, we assume without deciding that the system in question is automated. *Smidt v. Porter*, 695 N.W.2d 9, 14 (Iowa 2005).

assessment of the NSF fee. After the NSF fees are applied to a customer's account, a reviewing West Bank employee has the discretion to waive the fees. The plaintiffs in this case had NSF fees waived on at least one occasion. The NSF fee West Bank charged customers was originally $27.00. It was later raised to $30.00. West Bank sets its NSF fee based on market studies of competitors.

West Bank does not post customer account balances in real time. Rather, transactions are posted in a batch at the end of the day. Prior to July 1, 2006, West Bank posted bank card transactions with the lowest amount for each day's debits posted first and the highest amount posted last (low-to-high sequencing). After July 1, 2006, West Bank reversed its posting sequencing and posted bank card transactions with the highest amount posted first and the lowest amount posted last (high-to-low sequencing). Beginning October 1, 2010, West Bank changed its posting order back to low-to-high sequencing.

After the 2006 change, a Miscellaneous Fees document was provided to customers that included two footnotes relating to sequencing. The first footnote stated, "[C]hecks written on your account will be paid in order daily with the largest check paid first and the smallest check paid last." The second footnote provided that insufficient fund charges applied to "items" posted to accounts and defined items to include checks, money transfers, ATM debits, debit card debits, and ACH debit withdrawals.

In 2009, footnote two on the Miscellaneous Fees document West Bank provided to customers was modified to state that overdrafts would be posted high to low, based on the amount of the transaction. It provided that

> [c]hecks written on your account will be paid in order daily with the largest items paid first and the smallest items paid last. NSF fees apply to overdrafts created by check, in person withdrawal, ATM withdrawal or other electronic means.

West Bank discussed in an internal memo that the low-to-high sequencing had created a business expectation for customers. West Bank acknowledged that an Iowa Bankers Association Compliance Officer had discussed the proposed high-to-low sequencing order with an attorney and concluded in an internal memo that customers would need to be notified of the change. The summary judgment record supported an inference that West Bank made the change without adequately notifying its customers.

In August 2009, September 2009, and May 2010, the Leggs were charged NSF fees after West Bank instituted the new high-to-low sequencing. On August 31, the Leggs made two separate POS purchases in the amounts of $6.50 and $5.91, which resulted in overdrafts to their account. West Bank charged the Leggs $27.00 per POS purchase. On September 2, the Leggs made a $5.50 electronic payment which resulted in an overdraft to their account, and West Bank charged the Leggs a NSF fee of $27.00. The Leggs repaid these amounts on September 4. On September 17, the Leggs wrote a check for $560, which overdrew their account. The Leggs also made two POS purchases in the amounts of $10.89 and $9.00. West Bank charged the Leggs an NSF fee of $27.00 for each POS purchase, and the Leggs repaid both on September 18.[2] In all of these transactions, West Bank paid for the purchases.

---

[2]If these amounts were finance charges under the Iowa Consumer Credit Code, as the Leggs subsequently alleged, then the amount of each charge exceeded the twenty-one percent limitation contained in Iowa Code section 537.2201(2) (2009).

On September 17, if the bank card transactions had been posted in the low-to-high sequence, the Leggs would have only been charged one NSF fee for one overdraft. On May 17, the Leggs were charged four NSF fees for bank card transactions. The Leggs would have only been charged two NSF fees if the transactions were posted low-to-high.

## II. Course of Proceedings.

The Leggs filed this action as a proposed consumer class action on September 29, 2010. Their petition has been amended twice. The petition as amended includes six counts. Counts I, II, III, and IV arise under the Iowa Consumer Credit Code (ICCC). These claims are the "usury claims" and are based on the Leggs' allegation that West Bank's collection of NSF fees amounts to a finance charge in excess of twenty-one percent in violation of Iowa Code section 537.2201 (2009). Counts V and VI are the "sequencing claims," and they arise from West Bank's decision to process bank card transactions from high to low.

On April 8, 2013, West Bank filed its first motion for summary judgment. The motion for summary judgment asked the district court to dismiss all of the Leggs' usury claims except Count III, a claim arising under the Iowa Ongoing Criminal Conduct Act. *See* Iowa Code ch. 706A. The Leggs resisted West Bank's first motion for summary judgment. On August 14, West Bank filed a second motion for summary judgment, seeking to dismiss the Leggs' sequencing claims. The Leggs resisted the second motion for summary judgment. On September 5, West Bank filed a third motion for summary judgment, seeking to dismiss Count III. The Leggs resisted the third motion for summary judgment.[3]

---

[3]The plaintiffs alleged West Bank violated chapter 706A because the willful and knowing charging of finance charges over the statutory limit was a qualifying criminal

Before the hearing on the motions for summary judgment, the Iowa Superintendent of Banking filed a "Superintendent Guidance" regarding the definition of finance charges under the ICCC. The guidance defines one-time NSF fees as "account fee[s] related to the maintenance of the customer's deposit account with the bank." Iowa Superintendent of Banking, Superintendent Guidance No. SG-2014-01, One-Time Overdraft Fees (Jan. 7, 2014), *available at* www.idob.state.ia.us/bank/docs/bulletinguidances.aspx. The Leggs assert this is a departure from the previous guidances and bulletins issued by the Superintendent.

The district court held a hearing on West Bank's three motions for summary judgment on January 9 and 10, 2014. In a ruling issued March 14, the district court denied West Bank's motions for summary judgment on the usury and sequencing claims, and granted its third motion for summary judgment. After the district court ruling, the Iowa legislature amended the ICCC to exclude NSF fees from the definition of a finance charge.[4] West Bank applied for interlocutory appeal on the district court ruling on its motions for summary judgment, which we granted. West Bank also moved for interlocutory appeal on the district court ruling on class certification, which we also granted. We address

_____

act. West Bank filed a motion for summary judgment on this claim, which the district court granted. No appeal was taken from that ruling.

[4]The amendment made an NSF fee an additional item expressly excluded from the definition of finance charge. The amendment reads as follows:

> (5) An initial charge imposed by a financial institution for returning an item presented against non-sufficient funds or for paying an item that overdraws an account. For the purposes of this subparagraph, "*item*" includes any form of authorization or order for withdrawal of funds from an account such as a check, automated teller machine card, debit card, automated clearinghouse or other means.

2014 Iowa Acts ch. 1037, § 15 (codifed at Iowa Code § 537.1301(21)(*b*)(5) (2015)).

the appeal from the class certification in a separate opinion filed today. *Legg v. West Bank*, ___ N.W.2d ___ (Iowa 2016).

### III. Standard of Review.

Our review of a grant or denial of summary judgment is for corrections of errors at law. *Griffen Pipe Prods. Co. v. Bd. of Review*, 789 N.W.2d 769, 772 (Iowa 2010). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgement as a matter of law." *Id.* We view the record in the light most favorable to the Leggs as the parties opposing summary judgment. *Id.*

### IV. Analysis.

We are asked to determine whether the district court ruling on West Bank's motions for summary judgment was proper. We address the remaining usury claims first, followed by the sequencing claims.

**A. The Usury Claims.** The usury claims arise under the ICCC. The purpose of the ICCC is to "[s]implify, clarify and modernize the law governing retail installment sales and other consumer credit" and to "[p]rotect consumers against unfair practices." Iowa Code § 537.1102(2)(*a*), (*d*) (2009). The ICCC notes that it "shall be liberally construed and applied to promote its underlying purposes and policies." *Id.* § 537.1102(1).

The Leggs' usury claims were challenged below on two grounds: (1) that the bank's payment of the overdraft amounts did not constitute an extension of credit and (2) that the NSF fees were not finance charges. Because we find that the payment of the overdraft amount is not an extension of credit, we do not need to address whether the NSF fees were finance charges. This is because the cap on finance charges in the ICCC applies only to "creditors . . . extending credit in consumer credit

transactions." *Id.* § 537.1108(1). Similarly, the ICCC defines a finance charge as a charge that is "imposed . . . by the creditor as an incident to or as a condition of the extension of credit." *Id.* § 537.1301(21)(*a*). Therefore, since we find there is no extension of credit, we need not address whether the NSF fees constitute a finance charge.

The Leggs argue that the payment of overdrafts constitute extensions of credit by West Bank. The district court concluded that the payments of overdraft amounts were extensions of credit under the ICCC. The ICCC "prescribes maximum charges for certain creditors . . . extending credit in consumer credit transactions." *Id.* § 537.1108(1). We must therefore decide whether the payment of overdrafted amounts on bank card transactions are an extension of credit under the ICCC.

The ICCC defines "creditor" as a "person who grants credit in a consumer credit transaction." *Id.* § 537.1301(18). The ICCC defines "credit" as "the *right* granted by a person extending credit to a person to defer payment of debt, to incur debt and defer its payment, or to purchase property or services and defer payment therefor." *Id.* § 537.1301(16) (emphasis added). In a number of consumer credit sale cases under the ICCC, this court has been asked to determine whether particular transactions constitute an extension of credit. *See, e.g.*, *Anderson v. Nextel Partners, Inc.*, 745 N.W.2d 464, 465 (Iowa 2008); *State ex rel. Miller v. Nat'l Farmers Org.*, 278 N.W.2d 905, 906–07 (Iowa 1979). While this case does not deal with a consumer credit sale, the definition of credit under the ICCC is the same regardless of the type of consumer transaction—consumer credit sale, consumer lease, or consumer loan— and thus, we find these cases instructive. *See* Iowa Code § 537.1301(12). In determining whether there was an extension of credit, we asked whether the individual had the ability to defer payments and

when the money was "due and payable." *See, e.g., Miller*, 278 N.W.2d at 907 ("Nothing in the agreement allows the member to defer payment of dues. They are 'due and payable' at the date of making application and annually thereafter. Nor is any provision made for deferring payment of the annual assessment.").

In each of these cases, we held that the parties' agreement needed to grant the debtor the right to defer repayment in order for there to be an extension of credit. In *Miller*, we looked at the content of the membership agreement and ultimately concluded that the agreement did not constitute a grant of credit as it is defined under the ICCC. *Id.* at 906–07. We were concerned with whether the membership agreement granted a right to the members to defer the payment of dues and assessments. *Id.* at 907. The language of the membership agreement made dues due and payable at the time of signing and did not include any provision granting members the right to defer payment. *Id.* We noted that "[d]elay by the [National Farmers Organization] in attempting to collect past dues and assessments does not establish that credit was granted; it only demonstrates forbearance in collecting sums which, if owed, were due and payable at the time the debts were incurred." *Id.* We held that there was no grant of credit and therefore the ICCC did not apply to the transactions in question. *Id.* at 905.

Similarly, in *Muchmore Equipment*, we examined the contract between the parties to determine if it contained a right to defer payment. *Muchmore Equip., Inc. v. Grover*, 315 N.W.2d 92, 98–99 (Iowa 1982), *superseded by statute on other grounds*, Iowa Code § 535.2(2)(*a*)(5) (1989), *as recognized in Power Equip., Inc. v. Tschiggfrie*, 460 N.W.2d 861, 863 (Iowa 1990). Because the contract required payment in full upon completion, we held that there was no extension of credit. *Id.* at 98. In

*Anderson*, we again examined the service agreement between the parties to determine whether there was a right to defer payment. 745 N.W.2d at 468–69. The customers were required to pay charges "as they were billed." *Id.* at 468. We found that the agreement did not allow customers to defer payment of monthly invoices and that there was no extension of credit. *Id.* at 468–69.

Similar to the situation in these three cases, the Agreement signed by West Bank's customers does not extend any right to defer payment. Rather, the Agreement expressly gives West Bank the right to immediately collect payment as soon as a customer deposits sufficient funds to cover the overdraft into their account. In other words, the overdraft payment advanced on bank card transactions is due and payable at the time the account is overdrawn. The customer has no right to defer the payment past the first time there is sufficient money in the account to cover the repayment of the overdraft. West Bank has the right to immediately withdraw the amount the bank paid for the overdraft from the customer's account as soon as that amount is available. West Bank is not required to notify customers that the money sufficient to repay the overdraft will be withdrawn from their account because, at the time of the insufficient funds transaction, the amount the bank paid for the overdraft becomes due and payable.

The plaintiffs argue that they have the right to defer payment of the overdraft amount because, by definition, it cannot be paid until a later date. However, the language of the ICCC is that an extension of credit exists when the "*right* . . . to defer payment" has been granted. Iowa Code § 537.1301(16) (2009) (emphasis added). Here, West Bank customers have not been granted a right to defer payment; rather, they must pay the bank back immediately upon their next deposit. This is

because the overdraft is due and payable as soon as it is created; customers have no right or choice to defer the payment past the next deposit sufficient to cover the amount owed.

The Leggs also point to a line of cases where the court has held that payment of an overdraft on checks is either an unsecured loan or an extension of credit. *See, e.g., Clinton Nat'l Bank v. Saucier*, 580 N.W.2d 717, 720 (Iowa 1998). However, these cases did not arise under the ICCC. *See, e.g., id.* The ICCC definition of credit in section 537.1301(16) is much more narrow than the common law definition. Iowa Code § 537.1301(16) (" 'Credit' means the right granted by a person extending credit to a person to defer payment of debt, to incur debt and defer its payment, or to purchase property or services and defer payment therefor."). When the legislature chooses to define words in a statute, "the common law and dictionary definitions which may not coincide with the legislative definition must yield to the language of the legislature." *Sherwin-Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 425 (Iowa 2010) (quoting *Hornby v. State*, 559 N.W.2d 23, 25 (Iowa 1997)). Therefore, we confine our inquiry to the definition of credit under the ICCC.

Since we find that the payment of overdraft amounts on bank card transactions does not constitute an extension of credit under the ICCC, the district court should have granted West Bank's motion for summary judgment on the usury claims.

**B. Sequencing Claims.** The Leggs' sequencing claims are based upon West Bank's decision to switch from low-to-high sequencing to high-to-low sequencing between July 1, 2006, and September 30, 2010. The Leggs assert that the change to high-to-low sequencing resulted in

unjust enrichment to West Bank and was in violation of West Bank's duty to act in good faith.

1. *Unjust enrichment.* The Leggs assert that West Bank's change to high-to-low sequencing with the intent to gain income for the bank resulted in unjust enrichment.[5] A claim for unjust enrichment "arises from the equitable principle that one shall not be permitted to unjustly enrich oneself by receiving property or benefits without making compensation therefor." *Ahrendsen ex rel. Ahrendsen v. Iowa Dep't of Human Servs.*, 613 N.W.2d 674, 679 (Iowa 2000). The Leggs allege that West Bank's previous practice of posting bank card transactions from low-to-high created an expectation for its customers that it would continue to post in that order. They assert that any income the bank gained from the change in posting order was at the expense of customers and therefore unjustly enriched West Bank. West Bank counters that the Leggs cannot continue with their unjust enrichment claim because an express contract already exists that allows West Bank to charge customers a NSF fee for insufficient bank card transactions. Additionally, there is express contract language that addresses the

---

[5]Count V of the Leggs' amended petition claim for relief reads as follows:

> WHEREFORE, Plaintiffs, individually and on behalf of the proposed class respectfully request that the Court order West Bank to repay to Plaintiffs and the proposed class all overdraft fees paid in excess of the statutorily allowable rate and all overdraft fees charged as a result of West Bank's practice of sequencing Bank Card Transactions from highest amount to lowest amount, together with interest as provided by law, punitive damages, and for such further relief as is equitable.

The plaintiffs' claim for unjust enrichment seems to be based both on the usury claims ("in excess of the statutorily allowable rate"), and the sequencing claims ("practice of sequencing"). Because we conclude it was error for the district court not to grant summary judgment to West Bank on the usury claims, we only address the claim for unjust enrichment based on the practice of sequencing.

sequencing of postings. The district court held that the unjust enrichment claim was not based on the express contract between the Leggs and West Bank, and therefore the Leggs could proceed with the claim.

Contracts may be either express contracts or implied contracts. *Hunter v. Union State Bank*, 505 N.W.2d 172, 177 (Iowa 1993). A contract is express when the parties reach an agreement by words. *Id.* A contract is implied if it is manifested by the conduct of the parties. *Id.* A person who pleads an express contract ordinarily cannot also recover under an implied contract. *Scott v. Grinnell Mut. Reins. Co.*, 653 N.W.2d 556, 561 (Iowa 2002). "An express contract and an implied contract cannot coexist with respect to the same subject matter, and the former supersedes the latter." *Chariton Feed & Grain v. Harder*, 369 N.W.2d 777, 791 (Iowa 1985). "Although we have held there may be a contract implied in law on a point not covered by an express contract, there can be no such implied contract on a point fully covered by an express contract and in direct conflict therewith." *Smith v. Stowell*, 256 Iowa 165, 174, 125 N.W.2d 795, 800 (1964). The district court found that the sequencing order in which West Bank posts bank card transactions was not expressly covered in the contract between the Leggs and West Bank. We do not agree.

When the Leggs opened their account with West Bank, they signed a signature card on which they agreed "to be bound by the rules and regulations of this bank governing deposit accounts." They also agreed "to the terms, conditions, fees and earnings of the account as outlined in the <u>Deposit Account Agreement</u> brochure provided." The Agreement specifically addressed NSF fees. The Agreement included a Miscellaneous Fees document that listed the amount of all fees charged

by the bank, including NSF fees. Between 2006 and 2008, the Miscellaneous Fees document listed the amount owed per insufficient funds transaction (three free, then $27.00 each). It also noted in a footnote that "checks written on your account will be paid in order daily with the largest check paid first and the smallest check paid last." This footnote was followed by: "Insufficient check charges apply to items posted in your account. An item is defined to include the following: Check money transfer, ATM debit, debit card debit, ACH debit withdrawal." In 2009 and 2010, the Miscellaneous Fees document listed NSF fees as $27.00 and included a similar footnote that stated:

> Checks written on your account will be paid in order daily with the largest items paid first and the smallest items paid last. NSF fees apply to overdrafts created by check, in-person withdrawal, ATM withdrawal or other electronic means.

Further, the Agreements issued each year the Leggs were customers stated that the depositor agreed that the terms may be amended or modified from time to time.

The signature card, along with the Agreement and accompanying documents, demonstrate that West Bank and its customers have an express agreement that allows West Bank to charge NSF fees on bank card transactions and grants West Bank discretion in choosing the sequencing order. Further, the Leggs' petition does not allege what the implied contract term might be.[6] Because the issue of sequencing is

---

[6]The amended petition, as it relates to the unjust enrichment sequencing claims, only alleges:

> 103. West Bank's previous pattern and practice of debiting amounts from low to high had created an expectation in its customers that West Bank would debit accounts in that order and thus created an expectation that West Bank would continue to debit amounts from low to high.

expressly covered within the contracts between the Leggs and West Bank, no claim for unjust enrichment is available. The district court erred by not granting summary judgment to West Bank on this claim.

2. *Good faith.* Finally, the Leggs claim that West Bank breached the implied and express duties of good faith when it changed the sequencing order of bank card transactions to high-to-low without informing customers. West Bank argues that Article 4 of the Uniform Commercial Code (UCC) applies. A comment to the good-faith section found in the general provisions of the UCC—which apply to all articles including Article 4—provides that the section

> does not support an independent cause of action for failure to perform or enforce in good faith. Rather, [the] section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract.

U.C.C. § 1–203 cmt.*,* 1 U.L.A. 273 (2012). The district court held that the Leggs may maintain a cause of action against West Bank on this claim based upon the express contractual good-faith obligation contained in the Agreement and upon an implied obligation on the part of West Bank to exercise discretion in good faith in carrying out the terms of the contract.

When the Leggs opened their account with West Bank, they were provided with an Agreement that included the statement that West Bank

---

104. West Bank's enrichment was at the expense of Plaintiffs and Class Members.

105. It is unjust to allow West Bank to retain the above benefits under the circumstances and the overdraft fees should be returned to Plaintiffs and Class Members.

106. West Bank acted with willful and wanton disregard to the rights of Plaintiffs and Class Members, entitling Plaintiffs to recover punitive damages.

"shall have an obligation to Depositor to exercise good faith and ordinary care in connection with each account." Before West Bank initiated the sequencing change, it consulted with an Iowa Bankers Association Compliance Officer. After this consultation, West Bank concluded in an internal memo that the previous practice of posting low-to-high created a business expectation with customers and it would be necessary to notify them of the change. Although West Bank's memo specifically discussed notifying its customers of the sequencing change with regard to bank card transactions, West Bank nonetheless made the change without notifying customers.

The district court, relying on the opinions of other courts that have heard similar issues, concluded that the plaintiffs could pursue their good-faith claims. One case the district court discussed addressed whether express contract terms were being carried out in good faith. In *In re Checking Account Overdraft Litigation*, the plaintiffs argued that the banks violated express contractual provisions to act in good faith by reordering postings to high-to-low sequencing. 694 F. Supp. 2d 1302, 1315 (S.D. Fla. 2010). The court found that the plaintiffs were not asking to vary the terms of the express contract. *Id.* Rather, they were asking that the bank carry out its express agreement to exercise its discretion regarding the posting sequencing in good faith. *Id.* at 1315. The court cited to a number of cases where other courts held that "when one party is given discretion to act under a contract, said discretion must be exercised in good faith." *Id.*; *see Amoco Prod. Co. v. Heimann*, 904 F.2d 1405, 1411–12 (10th Cir. 1990); *Alexander Mfg., Inc. v. Ill. Union Ins. Co.*, 666 F. Supp. 2d 1185, 1206 (D. Or. 2009); *Bybee Farms LLC v. Snake River Sugar Co.*, No. CV–06–5007–FVS, 2008 WL 4454054, at *12 (E.D. Wash. Sept. 29, 2008).

Similarly, West Bank has discretion with regard to the sequencing order of bank card transactions in its agreements with the Leggs and its other customers. The bank wrote the duty of good faith into its contract with customers. The Leggs could reasonably argue that the change in sequencing of bank card transactions, coupled with the lack of notification, violated the reasonable expectations of customers that the bank act in good faith when exercising its discretion to sequence transactions. Therefore, the district court did not err in denying West Bank's motion for summary judgment on the express contractual provision requiring West Bank to act in good faith. Because we find an express contract governs West Bank's duty to act in good faith, we find the district court erred in concluding that a claim based on an implied duty of good faith was preserved. *See, e.g., Chariton Feed & Grain*, 369 N.W.2d at 791 ("An express contract and an implied contract cannot coexist with respect to the same subject matter, and the former supersedes the latter.").

**C. Limitation of Actions.** West Bank argues that the Leggs' usury claims are subject to a one-year statute of limitations under Iowa Code section 537.5201(1). The bank argues that section 537.5201(1) limits the claim for damages to one year and section 537.5201(3) limits claims for excess charges to one year. *Id.* § 537.5201(1), (3). Because we dismiss the plaintiffs' usury claims, we decline to address what the appropriate statute of limitations would be under the ICCC.

The only remaining claim—that the bank violated the express duty of good faith—is a contractual claim. Iowa Code section 614.1 covers the statute of limitations for both written and unwritten contractual provisions. *Id.* § 614.1(4)–(5). Written contracts are subject to a ten-year statute of limitations, while unwritten contracts are subject to a five-year

statute of limitations. *Id.*; *see also Robinson v. Allied Prop. & Cas. Ins. Co.*, 816 N.W.2d 398, 402 (Iowa 2012).

In order to determine the appropriate statute of limitations for a cause of action, we look to the foundation of the action. *Sandbulte v. Farm Bureau Mut. Ins. Co.*, 343 N.W.2d 457, 462 (Iowa 1984), *overruled on other grounds by Langwith v. Am. Nat'l Gen. Ins. Co.*, 793 N.W.2d 215, 223 (Iowa 2010). "In order for a cause of action to be founded upon a contract in writing, the *instrument itself must contain an undertaking to do the thing for the non-performance of which the action is brought.*" *Matherly v. Hanson*, 359 N.W.2d 450, 455 (Iowa 1984) (quoting *Kersten v. Cont'l Bank*, 628 P.2d 592, 594–95 (Ariz. Ct. App. 1981)).

In the past, when we have been faced with a claim based solely on the breach of the implied covenant of good faith, we found the claim was based on an unwritten contract and the five-year statute of limitations applied. *Sandbulte*, 343 N.W.2d at 460. However, we have also recognized that claims based on specific, written contracts fall under the ten-year statute of limitations contained in section 614.1. *See, e.g., Bob McKiness Excavating & Grading Co. v. Morton Bldgs., Inc.*, 507 N.W.2d 405, 408 (Iowa 1993). In this case, the Leggs' claim for the breach of the duty of good faith comes from the Agreement itself. The document itself states that West Bank will act in good faith with regard to sequencing. Because we find that the plaintiffs may only proceed on a claim of a breach of the duty of good faith based on the written contractual provision between customers and West Bank, we likewise find that the appropriate statute of limitations that governs this action is the ten-year limitation for written contractual provisions.

**V. Conclusion.**

We conclude that the district court erred when it denied summary judgment to West Bank on all the claims except the claim based on a potential breach of the express duty of good faith in the sequencing of postings of bank card transactions. The case is remanded for further proceedings consistent with this opinion.

**DECISION OF DISTRICT COURT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**