# IN THE SUPREME COURT OF IOWA

No. 19–1302

Filed April 17, 2020

**MIDWESTONE BANK,**

Appellee,

vs.

**HEARTLAND CO-OP,**

Appellant.

- - - - - - - - - - - - - - - - - - - - - - -

HEARTLAND CO-OP,

Counterclaim Plaintiff,

vs.

MIDWESTONE BANK,

Counterclaim Defendant.

Appeal from the Iowa District Court for Story County, Angela L. Doyle, Judge.

A grain co-op that deducted its cost of storing and drying grain from the sale price appeals a summary judgment awarding that amount in favor of a bank with a priority lien on farmer's crops and proceeds. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.**

Johannes H. Moorlach and Peter J. Chalik of Whitfield & Eddy, P.L.C., Des Moines, for appellant.

Matthew L. Preston and Cara L. Roberts of Brady Preston Gronlund PC, Cedar Rapids, and H. Raymond Terpstra II of Terpstra & Epping, Cedar Rapids, for appellee.

Douglas E. Gross, John D. Hunter, Margaret A. Hibbs, and Ingrid M. Johnson of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., Des Moines, for amicus curiae Agriculture Legal Defense Fund.

Debra Hulett and Haley Hermanson of Nyemaster Goode, P.C, Des Moines, for amicus curiae Iowa Institute for Cooperatives.

Robert L. Hartwig of Iowa Bankers Association, Johnston, and Julie Johnson McLean of Davis Brown Law Firm, Des Moines, for amicus curiae Iowa Bankers Association.

**WATERMAN, Justice.**

In this appeal, we must adjudicate competing claims by a secured lender and a grain elevator over the costs of storing and drying grain. Each side is supported by amici curiae briefs filed by trade organizations warning of dire consequences of an unfavorable resolution. All agree that the drying and storage costs were necessary to preserve the corn for sale. The farmer is insolvent. The parties disagree over the governing statute of limitations, the application of the discovery rule, and whether the elevator's common law unjust enrichment claims are superseded by the bank's prior perfected security interest in the grain and proceeds as codified in Iowa's Uniform Commercial Code (IUCC).

The dates and dollar amounts of the transactions as well as the terms of the relevant contracts and notifications are undisputed. There is no evidence that the bank directed the elevator to deduct the costs to preserve the collateral or that the bank had timely, actual knowledge and acquiesced in those deductions. The district court ruled in favor of the bank on cross-motions for summary judgment, allowing the bank to recoup those costs from the elevator. The district court ruled that the two-year limitations period in Iowa Code section 614.1(10) (2018) controlled rather than the five-year period in section 614.1(4), but it applied the discovery rule allowing the bank full recovery of those costs. The district court rejected the elevator's unjust enrichment claims. The elevator appealed, and we retained the case.

On our review, we hold the controlling statute of limitations is Iowa Code section 614.1(10), which bars the bank's claims filed more than two years from the date of sale of goods subject to its perfected security interest. The district court erred by applying the discovery rule. The district court correctly ruled the bank's prior perfected security interest

trumped the elevator's claim for storage and drying costs. The legislature resolved the competing policy arguments in the IUCC. Predictability and certainty are vital in these multi-party commercial transactions. Accordingly, we reverse the summary judgment in part and remand this case for entry of a revised judgment dismissing the bank's claims that are time-barred.

### I. Background Facts and Proceedings.

Justin Harker and his spouse Ashley Harker are farmers engaged in the commercial production of grains (corn and soybeans). The Harkers routinely sold and delivered their grain to Heartland Co-op (Heartland), a licensed grain dealer that operates a grain warehouse and handling facility in Cambridge. The Harkers had a contract with Heartland for the storage, drying, and sale of their grain. The Harkers were also customers of MidWestOne Bank (MidWestOne), located in Story County. The Harkers borrowed money from MidWestOne to pay for their farm operating expenses, and MidWestOne in return obtained a security interest in the Harkers' grain and sale proceeds.

Specifically, from 2013 through 2016, the Harkers borrowed money from MidWestOne under three promissory notes. MidWestOne filed a UCC-1 Financing Statement with the Iowa Secretary of State on February 29, 2012, and described as collateral "all farm products" and the "proceeds of any of the property [or] goods." On November 15, 2016, the Financing Statement was amended and timely continued.

Under an Agricultural Security Agreement dated February 20, 2014, MidWestOne obtained a security interest in the Harkers' farm products and the proceeds from the sale of those products. The collateral as described in the agreement includes all crops. The agreement required the Harkers to update MidWestOne on the location of the collateral and

prevented them from removing the collateral from its location without MidWestOne's consent unless they did so in the ordinary course of their business:

> **Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of [Harker's] business, or as otherwise provided for in this Agreement, [Harker] shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. [Harker] shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of [MidWestOne]. This includes security interests even if junior in right to the security interests granted under this Agreement. . . . Upon receipt, [Harker] shall immediately deliver any such proceeds to [MidWestOne].

The Harkers also agreed to ensure that the crops were properly maintained at their expense without allowing the attachment of liens by elevators:

> **Care and Preservation of the Crops.** [Harker] shall (1) At seasonable and proper times and in accordance with the best practices of good husbandry attend to and care for the crops and the tillage of the land and do, or cause to be done, any and all acts that may at any time be appropriate or necessary to grow, farm, cultivate, irrigate, fertilize, fumigate, prune, harvest, pick, clean, preserve, and protect the crops; (2) Not commit or suffer to be committed any damage to, destruction of, or waste of the crops . . . .
>
> . . . .
>
> **Repairs and Maintenance.** [Harker] agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. [Harker] further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

Additionally, the agreement required the Harkers to provide MidWestOne with a Schedule of Buyers listing the grain warehouses that they may use

to store and sell their grain with the buyer's checks to be payable jointly to MidWestOne and the Harkers:

> **Sale of Collateral.** The following provisions relate to any sale, consignment, lease, license, exchange, transfer, or other disposition of crops, livestock or other farm products included as all or a part of the Collateral:
>
> > (1) To induce [MidWestOne] to extend the credit or other financial accommodations secured by this Agreement, [Harker] represents and warrants to [MidWestOne] that [Harker] will sell, consign, lease, license, exchange, or transfer the Collateral only to those persons whose names and addresses have been set forth on sales schedules delivered to [MidWestOne]. Each schedule shall be in such form as [MidWestOne] may require, including identification of each type of Collateral.
> >
> > (2) [Harker] agrees to provide [MidWestOne] a written list or schedule of the buyers, commission merchants, and selling agents to or through an individual including the entity name, contact name and address to whom or through whom the crops, livestock or other farm products may be sold, consigned or transferred. . . .
> >
> > (3) All proceeds of any sale, consignment, lease, license, exchange, transfer, or other disposition shall be made immediately available to [MidWestOne] in a form jointly payable to [Harker] and [MidWestOne]. . . . All chattel paper, contracts, warehouse receipts, documents, and other evidences of ownership or obligations relating to the Collateral, whether issued by a co-op, grain elevator, warehouse, marketing entity, or bailee, and all accounts and other proceeds of the Collateral shall be immediately endorsed, assigned and delivered by [Harker] to [MidWestOne] as security for the Indebtedness.

Pursuant to the security agreement's terms, the Harkers gave MidWestOne a Schedule of Buyers for their corn and beans on three occasions between 2015 and 2016. The schedules identified Heartland as a buyer, and the Harkers verified that schedules were "a list of those buyers, selling agents, and commission merchants to whom [the Harkers] may sell, consign, or transfer the Farm Products as designated."

MidWestOne in turn gave Heartland documents titled "Notice to Buyer of Security Interest in Farm Products" on three occasions between 2014 and 2016. These notices informed Heartland that MidWestOne had a security interest in the Harkers' grain and directed them to make a joint payment to the Harkers and MidWestOne for all proceeds from the eventual sale of the grain.

Six sales transactions in which the Harkers sold grain to Heartland are at issue:

1. On January 7, 2014, the Harkers sold 33,402.65 bushels of corn at a price of $4.23 per bushel. The total sale price was $141,293.21. Heartland withheld $9,420.39 from the check for the cost of drying and storing. Heartland also withheld $2,234.01 for warehouse storage and $156.38 in tax.

2. On March 17, 2014, the Harkers sold 6,250 bushels of corn at a price of $4.52 per bushel. The total sale price was $28,250. Heartland withheld $26,861.80 for the cost of drying and storing.

3. On August 25, 2014, the Harkers sold 2,902.32 bushels of corn at a price of $3.43 per bushel. The total sale price was $9,954.96. Heartland withheld $756.52 for the cost of drying and storing.

4. On October 5, 2015, the Harkers sold 9,659.50 bushels of corn at a price of $3.82 per bushel. The total sale price was $36,899.29. Heartland withheld $5,072.40 for the cost of drying and storing.

5. On December 23, 2016, the Harkers sold 8,600.34 bushels of soybeans at a price of $10.00 per bushel. The total sale price was $86,003.40. Heartland withheld $35,070.30 for the cost of drying and storing.

6. On February 24, 2017, the Harkers sold 55,361.29 bushels of corn at a price of $3.20 per bushel. The total sale price was $177,156.13. Heartland withheld $323.88 for the cost of drying and storing.

In each transaction, Heartland deducted from the sale proceeds its costs of drying and storing the grain before sending the balance in a joint check to the Harkers and MidWestOne. The drying and storage charges were paid when the grain was sold through this withholding. In total, Heartland

withheld $79,895.68 from the sale proceeds. The withheld amounts were not used to service or pay any other debt that the Harkers owed to Heartland, and Heartland provided the Harkers with statements reflecting these withholdings. Neither the Harkers nor Heartland provided those statements to MidWestOne. MidWestOne claims it is owed those amounts based on its prior perfected security interest in the Harkers' grain and sale proceeds.

On March 16, 2018, MidWestOne filed this civil action alleging $79,895.68 in damages for the drying and storage charges withheld between 2014 and 2017 along with attorney fees and court costs. MidWestOne asserted that Heartland had a junior interest to MidWestOne's prior perfected security interest, that the offsets represented preexisting debt to Heartland, and that Heartland is not a buyer of grain in the ordinary course of business. Heartland filed an answer and asserted affirmative defenses of failure to state a claim, unjust enrichment, waiver, bailment lien, quantum meruit, course of dealing, usage of trade, and statute of limitations. Heartland filed an amended answer and counterclaim seven months later that alleged an additional affirmative defense, equitable set off. The counterclaim also asserted that Heartland was entitled to recover from MidWestOne for the value of the services provided to improve and protect the grain under the doctrine of equitable estoppel. MidWestOne filed a reply to the counterclaim. The parties filed cross-motions for summary judgment and resistances.

Heartland asserted that the two-year limitations period in Iowa Code section 614.1(10) for a "secured interest in farm products" applied because MidWestOne's conversion claims were based in its contention that it had a prior perfected security interest in the grain. Heartland also argued in favor of its many affirmative defenses. MidWestOne countered that section

614.1(4) for conversion claims provides the applicable five-year limitations period and, alternatively, argued that the discovery rule applied. MidWestOne argued Heartland's affirmative defenses failed as a matter of law.

On May 31, the district court granted MidWestOne's motion for summary judgment and denied Heartland's motion. The district court applied the limitations period for a "secured interest in farm products" in Iowa Code section 614.1(10) to MidWestOne's conversion claims after concluding that the more specific limitations period in section 614.1(10) overrides the general limitations period in section 614.1(4). The district court determined that the claims for the offsets on January 7, 2014; March 17, 2014; August 25, 2014; and October 5, 2015, fell outside the two-year limitation period. The district court determined those claims amounted to about $42,111. But the court applied the discovery rule based on MidWestOne's showing that it was unaware of Heartland's offsets before 2017. The court entered a judgment in favor of MidWestOne for $79,895.68 plus interest, costs, and attorney fees.[1]

Heartland moved to enlarge or amend the ruling, which the district court denied. Heartland appealed and we retained the case. The Iowa Bankers Association filed an amicus curiae brief supporting MidWestOne. The Agriculture Legal Defense Fund and the Iowa Institute for Cooperatives each filed a brief amicus curiae supporting Heartland.

## II. Standard of Review.

We "review a district court ruling on a motion for summary judgment for correction of errors at law." *Wells Fargo Equip. Fin., Inc. v. Retterath*, 928 N.W.2d 1, 5 (Iowa 2019) (quoting *Jahnke v. Deere & Co.*, 912 N.W.2d

---

[1]MidWestOne dropped its claim for attorney fees, and those are not at issue in this appeal.

136, 141 (Iowa 2018)). "Summary judgment is proper when the moving party has shown 'there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Jahnke*, 912 N.W.2d at 141 (quoting *Homan v. Branstad*, 887 N.W.2d 153, 163 (Iowa 2016)). Summary judgment is appropriate "if the record reveals only a conflict concerning the legal consequences of undisputed facts." *Nelson v. Lindaman*, 867 N.W.2d 1, 6 (Iowa 2015) (quoting *Wallace v. Des Moines Indep. Cmty. Sch. Dist. Bd. of Dirs.*, 754 N.W.2d 854, 857 (Iowa 2008)). We review evidence in the light most favorable to the nonmoving party. *Id.*

**III. Analysis.**

We first decide which statute of limitations governs and whether the discovery rule applies. We then address whether MidWestOne's prior perfected security interest supersedes Heartland's offset for the costs of storing and drying the corn.

**A. The Statute of Limitations.** MidWestOne argues its claims are subject to the general five-year statute of limitations in Iowa Code section 614.1(4) for injuries to property. Heartland argues the district court correctly ruled that MidWestOne's claims are subject to the more specific two-year statute of limitations in section 614.1(10) for claims based on a secured interest in farm products. We agree with Heartland.

We begin with the statutory language. Iowa Code section 614.1 states, in relevant part,

> Actions may be brought within the times limited as follows, respectively, after their causes accrue, and not afterwards, except when otherwise specially declared:
>
> . . . .
>
> 4. *Unwritten contracts — injuries to property — fraud — other actions.* Those founded on unwritten contracts, those brought for injuries to property, or for relief on the ground of fraud in cases heretofore solely cognizable in a court of chancery, and all other actions not otherwise provided for in

this respect, within five years, *except as provided by subsections 8 and 10.*

. . . .

10. *Secured interest in farm products.* Those founded on a secured interest in farm products, within two years from the date of sale of the farm products against the secured interest of the creditor.

(Emphasis added.) "The evident purpose behind § 614.1(10), which shortens the limitations period from five years under § 614.1(4) to two years for claims founded on secured interests in farm products, is to hasten resolution of such claims." *Farmers Coop. Co. v. Swift Pork Co.,* 602 F. Supp. 2d 1095, 1110 (N.D. Iowa 2009).

MidWestOne contends section 614.1(4) governs conversion claims for injuries to property, as we held in *Husker News Co. v. Mahaska State Bank,* 460 N.W.2d 476, 477 n.2 (Iowa 1990). But that case did not involve claims arising from a secured interest in farm products, the very claims at issue in this case. Iowa Code section 614.1(4) carves out such claims with its final phrase, "except as provided by subsections 8 and 10." From this language, the United States District Court for the Northern District of Iowa determined that

it is readily apparent that paragraph (10) is an exception to subsection (4)—that is, that subsection (4) applies unless subsection (10) applies—because subsection (4) expressly states a five-year statute of limitations for the pertinent actions, "except as provided by subsections 8 and 10."

*Farmers Coop. Co.,* 602 F. Supp. 2d at 1108–09 (quoting Iowa Code § 614.1(4)). We agree. Under the plain meaning of the text of the statute, subsection (4) applies to property damage claims unless subsection (8) or (10) apply.

Section 614.1(10) by its terms governs actions "founded on a secured interest in farm products." MidWestOne's contractual security interest through the Security Agreement and its UCC-1 Financing

Statement is a "secured interest." MidWestOne's Security Agreement specifically defines the collateral as "all farm products" that are "grown, growing, or to be grown" as well as the "proceeds" of any sale thereof. MidWestOne's conversion claims are founded on Heartland's alleged disregard of MidWestOne's "secured interest" in the Harker's grain, clearly a "farm product," and in the proceeds of the sale of that grain. Indeed, without the secured interest, MidWestOne would have no conversion claim against Heartland.

Our conclusion that section 614.1(10) controls over section 614.1(4) is buttressed by a familiar canon of construction: "To the extent 'there is a conflict or ambiguity between specific and general statutes, the provisions of the specific statutes control.'" *Oyens Feed & Supply, Inc. v Primebank*, 808 N.W.2d 186, 194 (Iowa 2011) (quoting *Freedom Fin. Bank v. Estate of Boesen*, 805 N.W.2d 802, 815 (Iowa 2011)). "[Iowa Code section] 614.1(10) is a more specific statute of limitations that is an exception to the more general statute of limitations in [section] 614.1(4)." *Farmers Coop. Co.*, 602 F. Supp. 2d at 1109; *see also* Iowa Code § 4.7 ("If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision."). We easily harmonize these provisions because subsection (4) expressly excludes claims governed by subsection (10). The district court correctly concluded that MidWestOne's claims are subject to the two-year limitations period in section 614.1(10).

**B. The Discovery Rule.** MidWestOne argues that the district court correctly applied the discovery rule to allow MidWestOne to recover on transactions that occurred more than two years before it filed its civil action. MidWestOne relies on the fact that it did not discover that

Heartland had deducted the cost of storing and drying the grain before 2017. Heartland argues the district court erred by applying the discovery rule to section 614.1(10). We agree with Heartland.

Under the discovery rule, the statute of limitations is tolled "until the plaintiff knows or in the exercise of reasonable care should have known both the fact of the injury and its cause." *K & W Elec., Inc. v. State*, 712 N.W.2d 107, 116 (Iowa 2006) (quoting *Rieff v. Evans*, 630 N.W.2d 278, 291 (Iowa 2001) (en banc)). When a plaintiff learns information that would inform a reasonable person of the need to investigate, the plaintiff is on inquiry notice of all of the facts that would have been discovered through a reasonably diligent investigation. *Hallett Constr. Co. v. Meister*, 713 N.W.2d 225, 231 (Iowa 2006). We have applied the discovery rule "when it would be unfair to charge 'a plaintiff with knowledge of facts which are "unknown and inherently unknowable." ' " *Mormann v. Iowa Workforce Dev.*, 913 N.W.2d 554, 567 (Iowa 2018) (quoting *LeBeau v. Dimig*, 446 N.W.2d 800, 802 (Iowa 1989)). Heartland's setoffs for its costs of drying and storing the grain were not inherently unknowable from MidWestOne's standpoint. MidWestOne could have asked Heartland or the Harkers for documentation that would have revealed those setoffs.

In *Husker News Co.*, we declined to apply the discovery rule to Iowa Code section 554.3419(1)(*c*) (1987) because doing so would be inconsistent with fundamental policies underlying the UCC. 460 N.W.2d at 477. There, we noted that "when interpreting any provision of the Uniform Commercial Code, we bear in mind its overriding purposes and objectives," which include uniformity among the states and "the presumption in favor of predictability and the finality of commercial transactions." *Id.* We noted that a majority of jurisdictions have declined to apply the discovery rule in UCC conversion cases, typically because of "(1) the need for finality in

transactions involving negotiable instruments, and (2) the presumption that property owners know where their property is located." *Id.* at 477–78.

We determined that the fundamental policies underlying the UCC favored a strict application of the limitation period for negotiable instruments. *Id.* at 479; *see also Mormann*, 913 N.W.2d at 569 ("Courts have held that equitable tolling principles do not apply to claims brought under the UCC, where a fundamental purpose of the statute is to establish clear rules for rapid commercial transactions."). We have refrained from applying the discovery rule when it would undermine the purpose of the statute. *See Husker News Co.*, 460 N.W.2d at 477.

We reach the same conclusion here for the same reasons. Finality and predictability in commercial transactions are equally salient in commercial farming enterprises. *See id.* at 478 ("We think the considerations of finality and predictability represented by the majority rule are substantial and outweigh the countervailing equities which led us to apply the discovery rule in other cases."). The agricultural industry involves multiple producers, lenders, suppliers, and vendors. As such, we must honor the UCC's preference for clear rules.

Applying the discovery rule would conflict with the plain language of section 614.1(10), which expressly provides that the date of sale starts the time clock. Iowa Code § 614.1(10) (2018) ("Those founded on a secured interest in farm products, *within two years from the date of sale* of the farm products against the secured interest of the creditor." (Emphasis added.)). We have refused to apply a discovery rule to other statutes of limitation that set forth the triggering event. *See, e.g., Schultze v. Landmark Hotel Corp.*, 463 N.W.2d 47, 50 (Iowa 1990) (recognizing that the discovery rule does not apply to a wrongful-death statute of limitations that runs from

the "date of death"); *see also Bergen v. Iowa Veterans Home*, 577 N.W.2d 629, 630 (Iowa 1998) (per curiam) (holding that there is "no basis for applying the discovery rule" when the limitation period is "within three years from the date of the last payment of weekly compensation benefits" (quoting Iowa Code § 85.26(1) (1989))); *Whitmer v. Int'l Paper Co., Folding Carton & Label Div.*, 314 N.W.2d 411, 412 (Iowa 1982) (en banc) (same). When the statute sets forth the triggering event,

> [t]here is no suggestion or hint in [the statute's] language that the legislature intended that we impose a different commencement date for the limitation period . . . . To further extend the limitation period would be contrary to the plain language of the subsection and the legislature's intent to restrict the length of time for commencing [the] action[].

*Schultze*, 463 N.W.2d at 50. "There is consequently no basis for applying the discovery rule" when the period runs from a specified event. *Bergen*, 577 N.W.2d at 630.

We hold that the discovery rule does not apply to Iowa Code section 614.1(10). Accordingly, MidWestOne's judgment must be reduced by the amount[2] withheld by Heartland in transactions occurring more than two years before this lawsuit was filed.

**C. Unjust Enrichment.** We now turn to Heartland's argument that the district court erred by rejecting its unjust enrichment claim. On appeal, Heartland does not claim it has a statutory lien or security interest under the IUCC.[3] All parties agree that the drying and storage costs were

---

[2]The district court calculated that amount to be $42,111. We note a mathematical discrepancy. On January 7, 2014, Heartland withheld an additional $2234.01 for warehouse storage and $156.38 in tax. The district court did not include these sums in its calculation of the amount that fell outside the two-year limitation period, yet the court did include these sums total amount claimed by, and awarded to, MidWestOne after it applied the discovery rule. This discrepancy can be resolved by the parties and district court on remand.

[3]Article 7 of the IUCC, Iowa Code chapter 554, includes a warehouse lien provision, Iowa Code section 554.7209 (2018). The district court rejected Heartland's

necessary to preserve the grain for sale. Heartland and its amici argue grain elevators routinely deduct drying and storage costs from the sale proceeds and that MidWestOne should have been aware of this common industry practice. The district court determined that MidWestOne was unaware that Heartland was deducting those costs, and there is no evidence the Harkers or Heartland notified MidWestOne of those deductions. The parties' contracts obligated the Harkers to pay those costs. MidWestOne argues that its prior perfected security interest in the grain and proceeds defeats Heartland's claims. We must decide whether the UCC priority system trumps Heartland's unjust enrichment claims on this record.

An unjust enrichment claim "arises from the equitable principle that one shall not be permitted to unjustly enrich oneself by receiving . . . benefits without making compensation therefor." *Legg v. W. Bank*, 873 N.W.2d 763, 771 (Iowa 2016) (quoting *Ahrendsen ex rel. Ahrendsen v. Iowa Dep't of Human Servs.*, 613 N.W.2d 674, 679 (Iowa 2000) (en banc)). Unjust enrichment exists when (1) one party is enriched (2) at the expense of the other, and (3) it would be unjust under the circumstances for the enriched party to retain the benefit. *Behm v. City of Cedar Rapids*, 922 N.W.2d 524, 577 (Iowa 2019).

We have never held that a grain elevator as an unsecured creditor can recover under a common law or equitable unjust enrichment theory against a bank with a valid perfected security interest in the grain and

warehouse lien claim, and Heartland has abandoned that claim in this appeal. MidWestOne argues the warehouse lien statute displaces Heartland's common law or equitable unjust enrichment claims. *See id.* § 554.1103(2) ("Unless displaced by the particular provisions of this chapter, the principles of law and equity . . . supplement its provisions."). We do not decide that question today. *Cf. Warder & Lee Elevator, Inc. v. Britten*, 274 N.W.2d 339, 341–42 (Iowa 1979) (en banc) (holding that Iowa Code section 554.2201 on statute of frauds does not displace doctrine of estoppel for oral sale of goods).

proceeds. To the contrary, we have held the bank is entitled to summary judgment enforcing its security interest in the grain proceeds. *First State Bank v. Clark*, 635 N.W.2d 29, 34 (Iowa 2001); *see also Peoples Tr. & Sav. Bank v. Sec. Sav. Bank,* 815 N.W.2d 744, 763–64 (Iowa 2012) (affirming summary judgment enforcing bank's security interest in cattle sale proceeds and rejecting waiver claim based on course of conduct); *accord Agrifund, LLC v. Heartland Co-op,* ___ F. Supp. 3d ___, ___, 2020 WL 486503, *3, *6 (S.D. Iowa Jan. 28, 2020) (granting summary judgment for secured lender against grain elevator enforcing security interest in crop proceeds). Our court of appeals has previously rejected a feed dealer's unjust enrichment claim against a bank for the enhanced value from the sale of pigs, holding that it was not unjust for the bank to receive the proceeds from the sale pursuant to the bank's valid security interest. *Larsen v. Warrington*, 348 N.W.2d 637, 643 (Iowa Ct. App. 1984), *overruled in part on other grounds by C & H Farm Serv. Co. of Iowa v. Farmers Sav. Bank*, 449 N.W.2d 866, 873–74 & n.3 (Iowa 1989).

Heartland relies primarily on the decision by the Colorado Supreme Court in *Ninth District Production Credit Ass'n v. Ed Duggan, Inc.*, 821 P.2d 788 (Colo. 1991) (en banc). The *Duggan* court held that under limited circumstances, a creditor with a perfected security interest in collateral could be liable "to an unsecured creditor based on a theory of unjust enrichment for benefits that enhance the value of the collateral." *Id.* at 793. Edmond Duggan supplied corn to a cattle feedlot. *Id.* at 792. Ninth District Production Credit Association (PCA) had a security interest in the feedlot's receivables. *Id.* at 790. A loan officer for PCA was present at the feedlot at times, knew that the cattle were eating the corn Duggan supplied, approved some orders for the corn, and never objected to the transactions. *Id.* at 792–93, 803. When the insolvent feedlot operator

failed to pay for the corn, Duggan sought reimbursement from PCA from the proceeds of the sale of the cattle. *Id.* at 793. PCA, asserting its secured status, refused to pay Duggan, an unsecured creditor, out of those funds. *Id.* Duggan sued PCA for unjust enrichment and won a jury verdict on that theory. *Id.* The Colorado Court of Appeals affirmed, and the Colorado Supreme Court granted certiorari, noting the "tension between the [UCC] priority system . . . and equitable principles of unjust enrichment." *Id.*

The *Duggan* court observed that the UCC "reflects the legislative judgment that the value of a predictable system of priorities ordinarily outweighs the disadvantage of the system's occasional inequities." *Id.* at 797. Yet the court also stated that the UCC "recognizes that equitable principles may require alteration of the priority system in particular circumstances." *Id.* After surveying cases nationwide, the court concluded that a determining factor is whether the secured creditor "initiates or encourages" the transactions that enhance the value of the collateral. *Id.* at 795–98. The *Duggan* court described the limited circumstances as follows:

> Where a secured creditor is benefitted by a transaction between its debtor and an unsecured creditor that enhances the value of the secured collateral, and the secured creditor initiates or encourages the transaction, the secured creditor can be held liable to the unsecured creditor on the theory of unjust enrichment.

*Id.* at 801. The court determined the jury had not been properly instructed and remanded the case for a new trial. *Id.*[4]

*Duggan* appears to represent the high water mark for allowing an unsecured creditor to recover against a secured creditor under an unjust enrichment theory. "Recovery is clearly the exception, not the norm, and

---

[4]Three dissenting justices would have affirmed the jury verdict. *Id.* at 804.

is subject to stern limitations." *Knox v. Phx. Leasing Inc.*, 35 Cal. Rptr. 2d 141, 145 (Ct. App. 1994). Other courts have strictly enforced the UCC priority system to reject unjust enrichment claims against secured creditors. *See, e.g., Nat'l Bank & Tr. Co. of S. Bend v. Moody Ford, Inc.*, 273 N.E.2d 757, 760 (Ind. Ct. App. 1971) ("Were this court to disregard the fact that [the appellee] has totally failed to comply with the provisions of the Uniform Commercial Code[,] the result would be little more than a judicial erasure of those sections of the Code upon which this case relies."); *Evans Prods. Co. v. Jorgensen*, 421 P.2d 978, 983 (Or. 1966) (en banc) ("The purpose and effectiveness of the UCC would be substantially impaired if interests created in compliance with UCC procedures could be defeated by application of the equitable doctrine of unjust enrichment."); *Peerless Packing Co. v. Malone & Hyde, Inc.*, 376 S.E.2d 161, 164 n.4 (W. Va. 1988) ("The UCC provides justice in the long run in large part through the certainty and predictability of its provisions, which should not be set aside absent truly egregious circumstances verging on actual fraud.").

We favor adhering to the UCC's priority system to provide clarity, uniformity, and consistency in commercial transactions. *See Husker News Co.*, 460 N.W.2d at 478. Those objectives would be undermined by allowing unjust enrichment claims against secured creditors.[5] But we

---

[5]We note that during the 2019 legislative session, an amendment was proposed to the warehouse lien statute in Iowa Code section 554.7209 that would have added a new subsection giving grain elevators a new priority over secured lenders:

> NEW SUBSECTION. 3A. Notwithstanding any provision in this section to the contrary, a warehouse's lien created in subsection 1, that is in favor of a warehouse operator licensed under either chapter 203C or the United States Warehouse Act, 7 U.S.C. ch. 10, is effective against all persons and is superior against all other competing security interests and agricultural liens.

S.S.B. 1251, 88th G.A., 1st Sess. § 29 (Iowa 2019). This amendment was passed by the Senate Appropriations Committee, S. Journal, 88th G.A., 1st Sess., at 814–15 (Iowa 2019), but it was never enacted, *cf.* 2019 Iowa Acts ch. 131 (2019). We defer to the

need not decide whether to allow such claims under the limited circumstances recognized in *Duggan* because Heartland lacks evidence that MidWestOne initiated or encouraged the elevator's practice of deducting drying and storage costs from the sale proceeds. Neither Heartland nor the Harkers sent MidWestOne documentation showing those deductions. The summary judgment record, including the uncontroverted affidavit testimony of a bank officer, established that MidWestOne lacked actual knowledge of those deductions before 2017. The Harkers were contractually obligated to pay the drying and storage costs. Heartland's unjust enrichment claims would fail even under *Duggan.*

Heartland and its amici argue that it is a common practice for grain elevators to deduct their storage and drying costs from the proceeds of the sale of the grain and that MidWestOne, as a farm lender, should have been aware of that practice and at least impliedly waived its lien rights through course of conduct and performance when it cashed checks without objection. On our review of the record, we reach the same conclusion as the district court—MidWestOne did not discover Heartland's deductions before 2017. In *Peoples Trust & Savings Bank,* we made clear that "a waiver can be established only upon showing that the creditor knowingly and intentionally waived [its] rights in the proceeds." 815 N.W.2d at 763. "Further, in order to establish implied waiver by conduct, there must exist clear, unequivocal, and decisive conduct demonstrating intent to waive." *Id.* The summary judgment record here is devoid of such evidence.

> While the actions of [the bank] may not have been a model of diligence, and even rather gullible, there is no triable issue on the question of an intentional and knowing waiver of [the

legislature whether to give grain elevators lien rights for storage and drying costs superior to a lender's prior perfected security interest in crops and their proceeds.

bank's] interest in the proceeds through clear, unequivocal, and decisive conduct.

*Id.* at 764.

Other courts, as we do today, have rejected unjust enrichment claims against secured creditors as factually unsupported even while acknowledging the authority allowing such claims under limited circumstances. *See, e.g.*, *Newsom v. Rabo Agrifin., Inc.*, 427 S.W.3d 688, 695 (Ark. Ct. App. 2013) ("[a]ssuming arguendo that under certain circumstances an equitable lien could prime a perfected security interest," the creditor "did as it was entitled to do under the law"); *Daniels-Sheridan Fed. Credit Union v. Bellanger*, 36 P.3d 397, 404 (Mont. 2001) (holding that "an equitable carve-out from the UCC's hierarchy of priorities is not justified" under the facts even if *Duggan* were followed). On this record, the district court correctly granted MidWestOne's motion for summary judgment dismissing Heartland's unjust enrichment claims.

## IV. Disposition.

For those reasons, we affirm the summary judgment rejecting Heartland's unjust enrichment claims. We reverse the summary judgment in part on the statute of limitations and remand this case for entry of a revised judgment consistent with this opinion dismissing the bank's claims that are time-barred.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.**